State *v.* Lebrick

STATE OF CONNECTICUT *v.* HORVIL F. LEBRICK
(SC 20083)

Robinson, C. J., and Palmer, McDonald, D'Auria, Mullins and Ecker, Js.

*Syllabus*

Convicted of the crimes of felony murder, home invasion, conspiracy to
commit home invasion, burglary in the first degree, attempt to commit
robbery in the first degree, and assault in the first degree in connection
with the shooting deaths of the victim and two of the defendant's accom-
plices, A and M, the defendant appealed to the Appellate Court, claiming,
inter alia, that the trial court had violated his constitutional right to
confrontation when it admitted into evidence the former testimony of
a purportedly unavailable witness, P, and the testimony of the state's
expert witness, S, about ballistic evidence. Pursuant to a court order, P
reluctantly testified at the defendant's probable cause hearing. P testified
that she had met with the defendant in Brooklyn, New York, on the day
after the shootings in question and that the defendant confessed that
he had gone to East Hartford with A and M intending to rob B, a drug
dealer. According to P, the defendant stated that he had kicked open
the door to B's apartment and encountered the victim, who was armed
with a gun. The defendant disarmed the victim and proceeded to another
room of the apartment, from where he heard several gunshots and the
shooter ask the victim how many people remained in the apartment. P
further testified that the defendant had told her that he then used the
gun he had taken from the victim to shoot his way out of the apartment
and past the bodies of A and M, both of whom apparently had been
shot. The state could not locate P before the defendant's trial and sought
to admit her former testimony from the probable cause hearing pursuant
to the provision (§ 8-6 [1]) of the Connecticut Code of Evidence allowing
for the admission at a subsequent trial of an unavailable witness' prior
testimony. The defendant moved to suppress P's former testimony on
the ground that the state had failed to establish P's unavailability insofar
as it had not made diligent and good faith efforts to procure her atten-
dance at trial. The court held a hearing on the motion at which an
inspector for the state's attorney's office, H, testified about his efforts
to locate P. H testified that he first conducted electronic searches in
the Hartford Police Department's in-house computer database and the
National Crime Information Center (NCIC) database, a national reposi-
tory of criminal records, but that those searches yielded no results. He
then used CLEAR, a subscription based search engine that aggregates
publicly available data, which revealed two addresses for P and one
address for P's mother, all of which were in New York, as well as several
phone numbers for P, none of which was in service or receiving calls.
H forwarded the addresses to the Kings County District Attorney's Office
in Brooklyn, and an investigator in that office, G, was assigned to serve

State *v.* Lebrick

an interstate summons on P. Over two days, G visited one of P's
addresses on three occasions and P's other address and her mother's
address one time each, but no one was home on any of those occasions.
The trial court denied the defendant's motion to suppress P's former
testimony, concluding that the state's efforts to locate P were sufficient
to establish her unavailability under both § 8-6 (1) of the Connecticut
Code of Evidence and the confrontation clause of the federal constitu-
tion. The defendant also moved to suppress S's expert testimony about
ballistic evidence, arguing that its admission would violate his right to
confrontation because it was based on a ballistic report, which the
defendant claimed contained testimonial hearsay, prepared by a former
employee of the state forensic laboratory who had examined the ballistic
evidence recovered from the crime scene but who was unavailable to
testify because he died before the defendant's trial. The trial court denied
the defendant's motion to suppress S's testimony, agreeing with the
state that there was no confrontation clause issue because S had formed
his own independent conclusions after reviewing the former employee's
report and photographs, and the defendant could cross-examine S at
trial. S ultimately testified, and the state emphasized during its closing
argument that the ballistic evidence indicated that the bullet that killed
the victim came from the gun used by the defendant. The Appellate
Court affirmed the judgment of the trial court, concluding, inter alia,
that the defendant's right to confrontation was not violated by the admis-
sion of P's former testimony. On the granting of certification, the defen-
dant appealed to this court. *Held*:

1. The Appellate Court incorrectly concluded that the admission of P's
former testimony did not violate the defendant's right to confrontation,
the state having failed to establish that it undertook a reasonable, dili-
gent, and good faith effort to procure P's attendance at the defendant's
trial: this court, having concluded that the issue of whether a witness
is unavailable for purposes of the confrontation clause presents a mixed
question of law and fact subject to plenary review, employed four objec-
tive criteria for determining the reasonableness of the state's efforts to
demonstrate the unavailability of a witness, including the importance
of the witness to the state's case, the seriousness of the crimes for
which the defendant was tried, whether the witness had reason to favor
the prosecution, and whether the state made the same sort of effort to
procure the witness for trial that it would have made if it did not have
the witness' prior testimony available; in the present case, although the
record did not reflect that P received any consideration for her testi-
mony, such as an immunity arrangement, the other three criteria weighed
in favor of the defendant because the defendant was charged with
extremely serious crimes, P's testimony was critical to the state's case
as she provided crucial, inculpatory testimony regarding the defendant's
role in the commission of the crimes that directly contradicted the
defendant's own statements about his version of the events and that
was not provided by any other witness, namely, that the defendant had
confessed that he had gone to the apartment intending to commit a

State *v.* Lebrick

robbery, he was armed with a gun that he had taken from the victim, and he had used that gun to shoot his way out of the apartment, and, in light of the crucial nature of P's testimony, the serious nature of the crimes, and the state's knowledge that P was a reluctant witness who had been compelled to testify at the probable cause hearing by court order, this court could not conclude that the state's efforts to locate P were as vigorous as they would have been if the state did not have her former testimony to rely on, as H conducted electronic searches for P in only three content limited databases, the usefulness of his searches in two of those databases was of questionable value in light of H's knowledge that P was a New York resident with no known criminal record, H's search in the third database was limited to only basic location information, H did not search any New York governmental databases for P's motor vehicle, social service, housing court, family court, or child support records, H did not conduct any routine Internet searches on Google or social media sites, once H had forwarded the three addresses he found for P to G, he never spoke to or requested that G, who visited the addresses associated with P only during normal business hours, make any additional efforts to locate her by returning to the addresses at other times of day, speaking with neighbors or landlords, or conducting surveillance, and, after G failed to locate P at any of the three addresses that H had provided, the state made no further efforts to locate her.

2. The admission of S's expert testimony did not violate the defendant's sixth amendment right to confrontation because, even if it was predicated in part on testimonial hearsay purportedly contained in a ballistic report prepared by a former employee of the state forensics laboratory and photographs that S had reviewed, such hearsay was not admitted into evidence or otherwise introduced to the jury for the truth of the matter asserted; although the jury had been informed that S had reviewed certain reports and photographs in preparation of his testimony, neither those materials nor the out-of-court statements that they contained were admitted into evidence as an exhibit or through the conduit of S's in-court testimony, the jury was not informed of the nature of the reports, who had prepared them, or whether S's opinions were consistent with those contained in the reports, and the trial court sustained the defendant's objection when the state attempted to question S as to which materials he had reviewed and ruled that S's testimony must be limited to S's own conclusions; accordingly, this court concluded that S applied his training and experience to reach an independent judgment about the ballistic evidence, the basis of which could be tested through cross-examination at the defendant's trial, and that S did not merely transmit the testimonial hearsay purportedly contained in the ballistic report prepared and photographs generated by the former employee of the state forensics laboratory.

(*Two justices concurring in part and dissenting in part in one opinion*)

Argued January 23, 2019—officially released January 28, 2020

State *v.* Lebrick

*Procedural History*

Substitute information charging the defendant with the crimes of felony murder, home invasion, conspiracy to commit home invasion, burglary in the first degree, conspiracy to commit burglary in the first degree, attempt to commit robbery in the first degree, conspiracy to commit robbery in the first degree, and assault in the first degree, brought to the Superior Court in the judicial district of Hartford, and tried to the jury before *Dewey, J.*; subsequently, the court denied the defendant's motions to preclude certain evidence; verdict of guilty; thereafter, the court vacated the jury's finding of guilty as to conspiracy to commit burglary in the first degree and conspiracy to commit robbery in the first degree and rendered judgment thereon, from which the defendant appealed to the Appellate Court, *Alvord, Prescott* and *Pellegrino, Js.*, which affirmed the judgment of the trial court, and the defendant, on the granting of certification, appealed to this court. *Reversed*; *new trial.*

*Raymond L. Durelli*, assigned counsel, for the appellant (defendant).

*Kathryn W. Bare*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, *John F. Fahey* and *Robert Diaz*, senior assistant state's attorneys, and *Allen M. Even*, certified legal intern, for the appellee (state).

*Opinion*

ECKER, J. The defendant, Horvil F. Lebrick, claims in this certified appeal that the Appellate Court improperly affirmed his judgment of conviction because the trial testimony of two witnesses should have been excluded from evidence under the Connecticut Code of Evidence and the confrontation clause of the sixth amendment to the United States constitution.[1] Specifically, the

_____

[1] The confrontation clause of the sixth amendment to the United States constitution, which is applicable to the states through the due process clause of the fourteenth amendment; *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065,

State *v.* Lebrick

defendant contends that (1) the state failed to establish adequately that a nonappearing witness named Keisha Parks was unavailable to testify at trial, and, therefore, her former testimony improperly was admitted under § 8-6 (1) of the Connecticut Code of Evidence[2] and in violation of the confrontation clause, and (2) the testimony of James Stephenson, the state's expert witness on firearm and tool mark identification, was predicated on inadmissible hearsay and, therefore, improperly was admitted in violation of the confrontation clause. We agree with the defendant that the admission of Parks' former testimony violated his constitutional right of confrontation, but we disagree that the admission of Stephenson's testimony was unconstitutional. We therefore reverse the judgment of the Appellate Court and remand the case for a new trial.

The jury reasonably could have found the following facts. During the early morning hours of May 6, 2010, the defendant and his cousins, twin brothers Andrew and Andraw Moses, traveled from New York to East Hartford in a Ford Econoline van driven by a fourth, unidentified man. At approximately 8 a.m., the van arrived at an apartment complex located at 115 Nutmeg Avenue, where a purported drug dealer, Omari Barrett, rented an apartment on the third floor. The plan was to rob Barrett of money and/or drugs. In order to gain entry into the apartment, the Moses twins dressed as workmen and armed themselves with guns. The defen-

13 L. Ed. 2d 923 (1965); provides in relevant part that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const., amend. VI.

[2] Section 8-6 of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

"(1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, provided (A) the issues in the former hearing are the same or substantially similar to those in the hearing in which the testimony is being offered, and (B) the party against whom the testimony is now offered had an opportunity to develop the testimony in the former hearing. . . ."

State *v.* Lebrick

dant accompanied the Moses twins to Barrett's apartment, where they knocked on the door multiple times. When no one answered, the defendant kicked the door open, and the three men entered the apartment.

The victim, Shawna Lee Hudson, was alone in the apartment at the time. The victim telephoned Barrett when the three men initially knocked on the door, and Barrett informed her that he had not requested any maintenance at the apartment. Shortly thereafter, the victim called Barrett a second time and told him that the three men were "breaking down the door to get in the apartment." Barrett informed the victim that he was on his way and instructed her to arm herself with a .357 magnum revolver located inside the apartment. Soon thereafter, the victim called Barrett a third time and whispered to him that the men were inside the apartment and that she was hiding in a closet. At this point, Barrett had arrived at the apartment complex and was on his way up to the third floor. Barrett could hear a voice in the background on the open phone line of someone saying, " '[w]here's the money? Shut the fuck up,' " and then the phone line went dead.

Barrett, who was armed with a nine millimeter revolver, arrived outside the apartment and noticed that the door was ajar and looked "like somebody [had] kicked it in . . . ." After entering the apartment, Barrett encountered the Moses twins, whom he fatally shot. Barrett then called out to the victim to ask how many people were left in the apartment, and she responded that there was one more. Barrett and the defendant then exchanged gunfire, and Barrett was shot twice— once in the leg and once in the arm. Barrett retreated from the apartment to an alcove down the hallway by the elevators. He then heard a single gunshot and saw someone exit the apartment and flee in the opposite direction down the hallway. Barrett returned to the apartment, where he found the victim, who had been

State *v.* Lebrick

shot fatally once in the chest. Additional facts will be set forth as necessary.

Following a jury trial, the defendant was convicted of felony murder in violation of General Statutes (Rev. to 2009) § 53a-54c, home invasion in violation of General Statutes §§ 53a-8 (a) and 53a-100aa (a) (2), conspiracy to commit home invasion in violation of General Statutes §§ 53a-48 (a) and 53a-100aa (a) (2), burglary in the first degree in violation of General Statutes §§ 53a-8 (a) and 53a-101 (a) (1), attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-134 (a) (2), and assault in the first degree in violation of General Statutes §§ 53a-8 (a) and 53a-59 (a) (5).[3] The trial court sentenced the defendant to a total effective sentence of ninety years of imprisonment.

The Appellate Court affirmed the defendant's judgment of conviction. See *State* v. *Lebrick*, 179 Conn. App. 221, 246, 178 A.3d 1064 (2018). As relevant to the issues before us, the Appellate Court determined that the trial court had not abused its discretion in admitting the former testimony of Parks, a witness who did not appear at trial but who reluctantly testified at the defendant's probable cause hearing, because the state had made a diligent and good faith effort to secure her attendance at the defendant's trial. Id., 229–36. The Appellate Court held, for this reason, that Parks' former testimony was admissible under both § 8-6 (1) of the Connecticut Code of Evidence and the confrontation clause. Id., 233, 236. The Appellate Court also determined that the admission of Stephenson's expert testimony did not violate the defendant's sixth amendment right of confrontation because, even if Stephenson had relied on testimonial

---

[3] The trial court vacated the jury's findings of guilty with respect to the charges of conspiracy to commit burglary in the first degree in violation of §§ 53a-48 (a) and 53a-101 (a) (1) and conspiracy to commit robbery in the first degree in violation of §§ 53a-48 (a) and 53a-134 (a) (2) because "[t]here can . . . be [only] one conspiracy."

State *v.* Lebrick

hearsay in formulating his expert opinion, he was "fully available for cross-examination at trial regarding his own scientific conclusions and the factual basis underpinning his opinion."[4] Id., 245. This certified appeal followed.[5]

I

The defendant's first claim of error involves the admissibility of the former testimony of Parks, who was Andrew Moses' fiancée at the time of the underlying events. The following additional facts and procedural history are relevant to our review of this claim.

After hearing a rumor on May 6, 2010, that the Moses twins had been killed in Connecticut, Parks contacted the East Hartford Police Department to find out if the rumor was true. Two days later, Parks provided the East Hartford police with a written statement, and, after the defendant's arrest, she reluctantly testified at his probable cause hearing pursuant to a court order.

Parks testified to the following facts at the defendant's probable cause hearing. On the evening of May 5, 2010, Parks observed the Moses twins enter the defendant's Ford Econoline van in Brooklyn.[6] The next day, after learning that the twins had been killed, Parks and

[4] The defendant also challenged the admission of Stephenson's expert testimony under § 4-1 of the Connecticut Code of Evidence, arguing that "the state failed to establish the relevancy of Stephenson's testimony by providing a sufficient evidentiary foundation that the photographs, report, and notes relied on by Stephenson were associated with the crimes at issue in this case." *State* v. *Lebrick*, supra, 179 Conn. App. 239. The Appellate Court declined to address that claim because it was not preserved in the trial court. Id., 240. The defendant has abandoned the claim in this certified appeal. Although we reverse the Appellate court's judgment insofar as it affirmed the judgment of conviction, we take no position concerning the Appellate Court's analysis with respect to this issue.

[5] We granted the defendant's petition for certification, limited to the following issues: (1) "Did the Appellate Court properly conclude that the trial court properly admitted the probable cause hearing testimony of . . . Parks?" And (2) "[d]id the Appellate Court properly conclude that the trial court properly admitted the testimony of . . . Stephenson?" *State* v. *Lebrick*, 328 Conn. 912, 179 A.3d 218 (2018).

[6] The evidence at trial established that the van was owned by Jamie Henlon, who had rented it to the defendant.

State *v.* Lebrick

Andraw Moses' wife spent several hours searching for the defendant. The defendant finally contacted Parks and Andraw Moses' wife, and they then met the defendant in Brooklyn. The defendant explained at the meeting that he had traveled to Connecticut with the twins and the unidentified driver of the van to commit a robbery. After knocking on an apartment door and receiving no answer, the defendant kicked the door open and found a girl inside the apartment with a gun. The defendant grabbed the gun from the girl and made his way to another room of the apartment. The defendant heard gunshots while he was in the other room, and one of the Moses twins went to investigate. The defendant heard another shot, and the other twin followed his brother to investigate. The defendant then heard another shot, followed by the shooter's asking the girl how many people were left in the apartment. The defendant proceeded to shoot his way out of the apartment using the gun he had taken from the girl, observing the twins' bodies lying on the floor as he left. He then exited the building, told the driver of the van that the twins were dead, and fled to New York.

In late August or early September of 2014,[7] around the time that jury selection in the defendant's trial commenced, the state began to search for Parks in order to secure her in-court testimony at the defendant's trial. Emory L. Hightower, a police inspector with the state's criminal justice division in the Hartford state's attorney's office, first attempted to contact Parks at her last known address and phone number. When that effort proved unsuccessful, Hightower conducted an electronic search for Parks in the Hartford Police Department's local in-house computer database. The search yielded no results. Hightower next searched

---

[7] At the defendant's trial, Emory L. Hightower, the inspector in the Hartford state's attorney's office assigned to locate Parks, testified on October 27, 2014, that he had commenced his search for Parks "approximately two months ago."

State *v.* Lebrick

the National Crime Information Center (NCIC) database, a national database administered by the Federal Bureau of Investigation and utilized by law enforcement to search for an individual's prior criminal records. After discovering no criminal record for Parks in the NCIC database, Hightower used a search engine called CLEAR, operated by the Thomson Reuters Corporation, which aggregates publicly available data. Through the CLEAR search, Hightower obtained two addresses for Parks in New York and several phone numbers. Hightower called the phone numbers, but two were not in service, and one was not receiving phone calls.

An interstate summons was prepared to compel Parks' attendance at the defendant's trial. Hightower e-mailed the interstate summons to the Kings County District Attorney's Office and requested service on Parks. The same e-mail included a memorandum containing the addresses and phone numbers that Hightower had found in the CLEAR system for Parks. Hightower also provided the Kings County District Attorney's Office with the last known address of Parks' mother, who lived in Brooklyn, New York.

Frank Garguilo, an investigator with the Kings County District Attorney's Office, was assigned the task of serving the interstate summons on Parks. Garguilo was not asked to conduct an independent investigation to ascertain Parks' whereabouts and did not do so. Over the course of two days, September 25 and 26, 2014, Garguilo visited each of the addresses associated with Parks. At approximately 12:30 p.m. on September 25, 2014, Garguilo visited the first address that Hightower had provided him for Parks in Brooklyn. After being let into the building by a neighbor, he knocked on the door of the apartment believed to belong to Parks, but he received no answer. Garguilo then called one of the phone numbers associated with Parks, but the greeting on the voicemail indicated that the phone number

State *v.* Lebrick

belonged to an individual named Miriam Augustine. Garguilo left a message asking Augustine to return his call but never received a response. Garguilo then traveled to the last known address of Parks' mother, also in Brooklyn, but no one was home. Garguilo returned to Parks' Brooklyn address for a second time at approximately 5 p.m., but again no one was home. The next morning, September 26, 2014, Garguilo made a third and final visit to Parks' Brooklyn address. When he was unsuccessful, he traveled to the last address for Parks that Hightower had provided, in the Jamaica neighborhood of Queens. No one was home at that location, either. Garguilo did not encounter anyone, at any of the addresses, whom he could question regarding Parks' whereabouts.

At the defendant's trial, the state sought to admit Parks' former testimony from the probable cause hearing pursuant to § 8-6 (1) of the Connecticut Code of Evidence, which permits the admission of "[t]estimony given as a witness at another hearing of the same or a different proceeding" if "the declarant is unavailable as a witness . . . ." The defendant moved to exclude Parks' former testimony, contending that the state had failed to establish Parks' unavailability under § 8-6 (1) because it had not "exercised due diligence and made a good faith effort to procure [her] attendance" at trial. The defendant further claimed that the admission of Parks' former testimony would violate his sixth amendment right of confrontation pursuant to *Crawford* v. *Washington*, 541 U.S. 36, 68–69, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

The trial court conducted a hearing on the defendant's motion to exclude Parks' former testimony, at which it heard the testimony of Hightower and Garguilo, as previously described, regarding their efforts to locate Parks. The trial court also heard testimony from Erin Tiernam, a CLEAR product specialist employed by the

State *v.* Lebrick

Thomson Reuters Corporation, regarding how CLEAR operates and the information available through it. Tiernam explained that CLEAR offers different subscription levels. The "basic subscription" includes "location services," such as credit headers and utility hookups, whereas the "second level includes the more detailed reports like . . . lawsuits, liens, judgments, [and] criminal records." There is also an additional option to add "a web analytic search," which aggregates social media data, such as "Facebook pages, LinkedIn pages, and also just somebody's general presence on the web." Tiernam did not know what subscription level Hightower had used to search for information about Parks.

Defense counsel argued that the state's efforts to procure Parks' in-court testimony were insufficient to meet the evidentiary and constitutional unavailability standard because the state had failed to search (1) social media websites, such as Facebook, (2) New York State Department of Motor Vehicles records, (3) New York State Department of Corrections and Community Supervision records, (4) housing and/or eviction records, (5) Social Security Administration records, (6) Immigration and Naturalization Service records, (7) records of protective orders or child support orders, and (8) for Parks' relatives, friends, and/or landlords, who might be aware of her whereabouts. The trial court disagreed, implicitly finding that the state's efforts to locate Parks were sufficient to establish her unavailability under both our rules of evidence and the confrontation clause of the sixth amendment.[8] Parks' former

_____
[8] Although the trial court did not make any explicit factual findings, its ruling necessarily included an implicit finding that the state's efforts to produce Parks' attendance at trial were reasonable, diligent, and conducted in good faith. See, e.g., *State* v. *Azukas*, 278 Conn. 267, 276, 897 A.2d 554 (2006) (holding that trial court's ruling on motion to suppress "necessarily included an implicit finding" on whether homeowner had authority to consent to search of bedroom that his daughter shared with defendant); *State* v. *Johnson*, 253 Conn. 1, 25, 751 A.2d 298 (2000) (holding that, "in accepting the defendant's guilty plea, the trial court implicitly found him [to be] competent").

State *v.* Lebrick

testimony was read to the jury. On appeal, the defendant contends that Parks' former testimony improperly was admitted in violation of § 8-6 (1) of the Connecticut Code of Evidence and the confrontation clause of the sixth amendment, both of which require the state to make a reasonable, diligent, and good faith effort to secure the in-court testimony of an unavailable declarant before the declarant's former testimony is admitted.

A

As a preliminary matter, we address the standard of review applicable to the defendant's evidentiary and constitutional claims. We previously have observed in general terms that "[t]he trial court has broad discretion in determining whether the proponent has shown a declarant to be unavailable. A trial court's determination of the unavailability of a witness will be overturned only if there has been a clear abuse of discretion." *State* v. *Lapointe*, 237 Conn. 694, 738, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996); accord *State* v. *Rivera*, 221 Conn. 58, 62, 602 A.2d 571 (1992). We explained that this deferential standard of review is appropriate "[i]n light of the [fact bound] nature of the [unavailability] inquiry . . . ." *State* v. *Schiappa*, 248 Conn. 132, 141, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999); see id., 145–58 (examining unavailability under statements against penal interest exception to hearsay rule); see also *State* v. *Wright*, 107 Conn. App. 85, 89, 943 A.2d 1159 (holding that, under § 8-6 [1], "the court's assessment of whether the actions of the state in attempting to find the witness properly could be characterized as having been undertaken with due diligence involve[s] a 'judgment call' by the court" properly reviewed under "the abuse of discretion standard"), cert. denied, 287 Conn. 914, 950 A.2d 1291 (2008). It is clear that the abuse of discretion standard applies specifically to a trial court's determination that a wit-

State *v.* Lebrick

ness is "unavailable" to testify under § 8-6 (1) of the
Connecticut Code of Evidence. See, e.g., *State* v. *Mor-
quecho*, 138 Conn. App. 841, 859 n.8, 54 A.3d 609
(reviewing defendant's challenge to admission of evi-
dence under § 8-6 [1] for abuse of discretion but noting
that "[t]he defendant does not raise a *Crawford* claim
and did not advance arguments of that nature before
the trial court"), cert. denied, 307 Conn. 941, 56 A.3d
948 (2012); *State* v. *Wright*, supra, 87–88 (rejecting
defendant's claim that reviewing court "should employ
a plenary standard of review" but noting that defendant
only raised evidentiary claim and did "not rais[e] a
*Crawford* confrontation clause issue").

It is less clear whether this deferential standard of
review applies with respect to a defendant's confronta-
tion clause claim challenging the admissibility of out-of-
court statements of an allegedly unavailable declarant
pursuant to *Crawford* v. *Washington*, supra, 541 U.S.
36. In our view, the abuse of discretion standard is at
odds with the axiomatic principle that "question[s] of
constitutional law . . . [are] subject to plenary
review." *State* v. *Kirby*, 280 Conn. 361, 378, 908 A.2d
506 (2006); see also *State* v. *Simpson*, 286 Conn. 634,
651, 945 A.2d 449 (2008) ("we exercise plenary review
over whether the trial court properly concluded that
the admission of the videotapes did not violate the
defendant's confrontation clause rights under *Craw-
ford*"). We therefore take this opportunity to clarify the
appropriate standard of review governing such claims.

Consistent with the case law of the United States
Circuit Courts of Appeals, we conclude that "[t]he
issues of the unavailability of the witness and the rea-
sonableness of the [s]tate's efforts to produce the wit-
ness [under] the [c]onfrontation [c]lause [of] the [s]ixth
[a]mendment . . . are mixed questions of law and fact
. . . ." *Hamilton* v. *Morgan*, 474 F.3d 854, 858 (6th
Cir.), cert. denied, 552 U.S. 953, 128 S. Ct. 380, 169 L.

State *v.* Lebrick

Ed. 2d 268 (2007); see also *McCandless* v. *Vaughn*, 172
F.3d 255, 265 (3d Cir. 1999) ("the ultimate issue of
unavailability for purposes of the [c]onfrontation
[c]lause is a mixed question of fact and law" [internal
quotation marks omitted]); *Martinez* v. *Sullivan*, 881
F.2d 921, 926 (10th Cir. 1989) (noting that "the ultimate
issue of unavailability for purposes of the [c]onfronta-
tion [c]lause is a mixed question of fact and law"), cert.
denied sub nom. *Martinez* v. *Tansy*, 493 U.S. 1029, 110
S. Ct. 740, 107 L. Ed. 2d 758 (1990); *Burns* v. *Clusen*, 798
F.2d 931, 942 (7th Cir. 1986) (holding that unavailability
under confrontation clause is "a mixed question of law
and fact").[9] As the United States Court of Appeals for
the Seventh Circuit has explained, a "finding of 'unavail-
ability' . . . has more resemblance to a 'mixed' deter-
mination rather than a straight finding of fact. The issue
takes on a constitutional dimension of its own when
analyzed in the context of the [c]onfrontation [c]lause,
as opposed to simply in the context of [the state's]
hearsay rules. A determination [of] 'unavailability' goes
beyond assessments of credibility and demeanor" and
"necessarily includes the ultimate legal issue at stake."
*Burns* v. *Clusen*, supra, 941. Accordingly, a trial court's
subordinate factual findings regarding the unavailability
of a witness "will not be disturbed unless clearly errone-
ous and the trial court's legal conclusion regarding the
applicability of the [law] in light of these facts will be
reviewed de novo." (Internal quotation marks omitted.)
*State* v. *DeMarco*, 311 Conn. 510, 518–19, 88 A.3d 491
(2014); see also *State* v. *Marquez*, 291 Conn. 122, 136,

---

[9] We recognize that the federal habeas cases cited here are subject to the
Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254,
which requires federal courts to apply a presumption of correctness to a
state court's factual findings. See 28 U.S.C. § 2254 (e) (1) (2012) ("a factual
issue made by a [s]tate court shall be presumed to be correct"). Nonetheless,
we conclude that the "mixed question of law and fact" standard appropriately
balances the traditional deference afforded to a trial court's factual findings
and the plenary review of a trial court's ultimate legal determination regard-
ing the existence of a constitutional violation.

State *v.* Lebrick

967 A.2d 56 (relying on ''federal precedent and the approach taken by our sister states'' to conclude that ''the ultimate question as to the constitutionality of . . . pretrial identification procedures . . . is a mixed question of law and fact'' [internal quotation marks omitted]), cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009).

''[W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [W]here the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . .'' (Internal quotation marks omitted.) *State* v. *DeMarco*, supra, 311 Conn. 519. Although ''we are bound to accept the factual findings of the trial court unless they are clearly erroneous''; *State* v. *Mangual*, 311 Conn. 182, 197, 85 A.3d 627 (2014); the ultimate determination of whether a witness is ''unavailable'' for purposes of the confrontation clause is reviewed de novo. See id.

B

The defendant claims that Parks' former testimony improperly was admitted because the state failed to demonstrate that Parks was unavailable within the meaning of our rules of evidence and the confrontation clause of the sixth amendment. To determine whether a witness is unavailable for purposes of § 8-6 (1) of the Connecticut Code of Evidence, ''this court follows the definition of the term 'unavailable' in rule 804 (a) of the Federal Rules of Evidence.'' *Maio* v. *New Haven*, 326 Conn. 708, 726, 167 A.3d 338 (2017). Under rule 804

508 JANUARY, 2020 334 Conn. 492

State *v.* Lebrick

(a), "[a] declarant is considered to be unavailable as a witness" for the purpose of admitting former testimony "if the declarant . . . is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure . . . the declarant's attendance . . . ." Fed. R. Evid. 804 (a) (5) (A). "In interpreting reasonable means, we have held that the proponent must exercise due diligence and, at a minimum, make a good faith effort to procure the declarant's attendance." (Internal quotation marks omitted.) *State* v. *Rivera*, supra, 221 Conn. 62.

Similarly, under the confrontation clause of the sixth amendment, a witness is not unavailable " 'unless the prosecutorial authorities have made a [good faith] effort to obtain his presence at trial.' " *Hardy* v. *Cross*, 565 U.S. 65, 69, 132 S. Ct. 490, 181 L. Ed. 2d 468 (2011), quoting *Barber* v. *Page*, 390 U.S. 719, 725, 88 S. Ct. 1318, 20 L. Ed. 2d 255 (1968). " 'The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness.' " *Hardy* v. *Cross*, supra, 70, quoting *Ohio* v. *Roberts*, 448 U.S. 56, 74, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), overruled on other grounds by *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). To demonstrate reasonableness, "the proponent must exercise due diligence and, at a minimum, make a good faith effort to procure the declarant's attendance." (Internal quotation marks omitted.) *State* v. *Rivera*, supra, 221 Conn. 62.

Former testimony therefore is inadmissible under both our rules of evidence and the confrontation clause unless the state has made a reasonable, diligent, and good faith effort to procure the absent witness' attendance at trial. "This showing necessarily requires substantial diligence. In determining whether the proponent of the declaration has satisfied this burden of making reasonable efforts, the court must consider what steps were taken to secure the presence of the witness and the timing of efforts to procure the declar-

State *v.* Lebrick

ant's attendance.'' *State* v. *Lopez*, 239 Conn. 56, 75, 681
A.2d 950 (1996). ''A proponent's burden is to demon-
strate a diligent and reasonable effort, not to do every-
thing conceivable, to secure the witness' presence.'' Id.,
77–78. Indeed, it is always possible, in hindsight, to
think of some ''additional steps that the prosecution
might have taken to secure the witness' presence,'' but
the ''[s]ixth [a]mendment does not require the prosecu-
tion to exhaust every avenue of inquiry, no matter how
unpromising.'' *Hardy* v. *Cross*, supra, 565 U.S. 71–72;
see also *Ohio* v. *Roberts*, supra, 448 U.S. 74 (''The law
does not require the doing of a futile act. Thus, if no
possibility of procuring the witness exists [as, for exam-
ple, the witness' intervening death], 'good faith'
demands nothing of the prosecution.''); *State* v. *Rivera*,
supra, 221 Conn. 67 (''the question of whether an effort
to locate a missing witness has been sufficiently diligent
to declare that person unavailable is one that is inher-
ently fact specific and always vulnerable to criticism,
due to the fact that [o]ne, in hindsight, may always
think of other things'' [internal quotation marks omit-
ted]). ''But if there is a possibility, albeit remote, that
affirmative measures might produce the declarant, the
obligation of good faith *may* demand their effectua-
tion.'' (Emphasis in original.) *Ohio* v. *Roberts*, supra, 74.

C

Turning to the merits of the defendant's claim, we
focus our analysis on the confrontation clause because
the definition of unavailability is the same under both
our rules of evidence and the confrontation clause, but
the ultimate determination of whether the state's efforts
are constitutionally sufficient to establish the unavail-
ability of the witness is a question of law reviewed de
novo.[10] See part I A of this opinion; see also *State* v.

[10] The defendant does not challenge, as a factual matter, the efforts under-
taken by Hightower and Garguilo to locate Parks prior to trial. Rather, his
claim is that these efforts were insufficient as a matter of law to establish
Parks' unavailability.

State *v.* Lebrick

*Cameron M.*, 307 Conn. 504, 516 n.16, 55 A.3d 272 (2012)
(recognizing our "general practice of not addressing
constitutional questions unless their resolution is
unavoidable" but nonetheless focusing analysis on con-
frontation clause because determination of unavailabil-
ity under our rules of evidence and confrontation clause
"is analytically identical" [internal quotation marks
omitted]), cert. denied, 569 U.S. 1005, 133 S. Ct. 2744,
186 L. Ed. 2d 194 (2013); *United States* v. *Tirado-Tirado*,
563 F.3d 117, 123 n.4 (5th Cir. 2009) ("[t]his [c]ourt
treats the [c]onfrontation [c]lause unavailability inquiry
as identical to the unavailability inquiry under [r]ule
804 [a] [5] of the Federal Rules of Evidence").

"The central concern of the [c]onfrontation [c]lause is
to ensure the reliability of the evidence against a crim-
inal defendant by subjecting it to rigorous testing in the
context of an adversary proceeding before the trier of
fact." *Maryland* v. *Craig*, 497 U.S. 836, 845, 110 S. Ct.
3157, 111 L. Ed. 2d 666 (1990). The right of confrontation
includes (1) the physical presence of the witness, (2)
the administration of an oath to impress upon the wit-
ness "the seriousness of the matter" and to guard
"against the lie by the possibility of a penalty for per-
jury," (3) cross-examination of the witness to aid in "the
discovery of truth," and (4) the opportunity for the jury
"to observe the demeanor of the witness in making his
statement, thus aiding the jury in assessing his credi-
bility." (Internal quotation marks omitted.) Id., 845–46.
The former testimony of an absent witness typically
was produced under oath at a proceeding at which the
witness was subject to cross-examination, but the
admission of this testimony nonetheless implicates con-
cerns under the confrontation clause because its use
deprives the jury of the opportunity to "observe closely
the [witness'] demeanor, expressions, and intonations,
and thereby [to] determine the [witness'] credibility."
*United States* v. *Smith*, 928 F.3d 1215, 1226 (11th Cir.

State *v.* Lebrick

2019), cert. denied, 88 U.S.L.W. 3225 (U.S. January 13, 2020) (No. 19-361).

"[I]n conformance with the [f]ramers' preference for face-to-face accusation, the [s]ixth [a]mendment establishes a rule of necessity. In the usual case (including cases [in which] prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Ohio* v. *Roberts*, supra, 448 U.S. 65. As we explained in part I B of this opinion, to demonstrate the unavailability of a witness, the state must establish that it made a reasonable, diligent, and good faith effort to procure the witness' attendance at trial. See *Hardy* v. *Cross*, supra, 565 U.S. 69 ("a witness is not unavailable for purposes of the . . . confrontation requirement unless the prosecutorial authorities have made a [good faith] effort to obtain his presence at trial" [internal quotation marks omitted]); *Ohio* v. *Roberts*, supra, 74 ("[t]he lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness," and "[t]he ultimate question is whether the witness is unavailable despite [good faith] efforts undertaken prior to trial to locate and present that witness" [internal quotation marks omitted]).

"[T]here is no [bright line] rule for reasonableness, and [the] reasonableness inquiry necessarily is [fact specific] and examines the totality of the factual circumstances of each particular case." *United States* v. *Smith*, supra, 928 F.3d 1228; see also *State* v. *Rivera*, supra, 221 Conn. 67 (emphasizing "fact specific" nature of unavailability inquiry). Although the United States Circuit Courts of Appeals have rejected a "per se rule" or "categorical approach" when it comes to assessing the reasonableness of efforts to produce a missing witness; *United States* v. *Burden*, 934 F.3d 675, 689 (D.C. Cir. 2019); they have identified four objective criteria to

State *v.* Lebrick

guide the reasonableness inquiry. "First, the more crucial the witness, the greater the effort required to secure his attendance. . . . Second, the more serious the crime for which the defendant is being tried, the greater the effort the [state] should put forth to produce the witness at trial. . . . Third, where a witness has special reason to favor the prosecution, such as an immunity arrangement in exchange for cooperation, the defendant's interest in confronting the witness is stronger. . . . Fourth, a good measure of reasonableness is to require the [s]tate to make the same sort of effort to locate and secure the witness for trial that it would have made if it did not have the prior testimony available." (Citations omitted.) *Cook* v. *McKune*, 323 F.3d 825, 835–36 (10th Cir. 2003); see also *McCandless* v. *Vaughn*, supra, 172 F.3d 266 ("Confrontation [c]lause concerns are heightened and courts insist on more diligent efforts by the prosecution where a 'key' or 'crucial' witness' testimony is involved. . . . The defendant's interest in confrontation is, of course, further heightened where the absent witness has special reason to give testimony favorable to the prosecution. . . . Finally, special sensitivity to [c]onfrontation [c]lause concerns is appropriate where the consequences of a conviction based on the absent witness' testimony are grave." [Citations omitted.]); *United States* v. *Quinn*, 901 F.2d 522, 529 (6th Cir. 1990) ("[c]onfrontation [c]lause considerations are especially cogent when the testimony of a witness is critical to the prosecution's case against the defendant" [internal quotation marks omitted]); *United States* v. *Lynch*, 499 F.2d 1011, 1023 (D.C. Cir. 1974) (government's duty to search for missing witness "in good faith and with reasonable diligence and care" ordinarily "will require a search equally as vigorous as that which the government would undertake to find a critical witness if it has no preliminary hearing testimony to rely [on] in the event of 'unavailability' "); *Brooks* v. *United States*,

State *v.* Lebrick

39 A.3d 873, 884 (D.C. 2012) (''[t]he government's obligation to take steps to produce the witness ha[s] to correspond to the importance of the witness and the potential prejudice to the defendant if she [does] not testify'').

We believe that this approach provides useful guidance and structure, and we will employ these four criteria here to assess whether the state's efforts to locate Parks were sufficient to protect the defendant's sixth amendment right of confrontation.[11] First, as the state conceded at oral argument before this court,[12] Parks was an important witness who provided key testimony that was not provided by any other witness, namely, the defendant's confession that he kicked in the door to Barrett's apartment, took the gun away from the victim, and shot his way out of the apartment.[13] Parks' testimony directly contradicted the defendant's statement to the police, in which he admitted that he was present in the apartment at the time of the shooting but maintained that he was there to help the Moses twins ''move some boxes'' when ''a guy showed up shooting.'' The defendant stated to the police that he did not have a gun and did not know that the Moses twins were armed with guns before the shooting began. The

---

[11] In doing so, we do not intend to suggest that other factors relevant to the reasonableness inquiry cannot be considered in any particular case.

[12] The state conceded at oral argument that, if Parks' former testimony improperly was admitted in violation of our rules of evidence or the confrontation clause, then the improper admission cannot be deemed harmless.

[13] Barrett was unable to identify the defendant as the individual who shot him and killed the victim. Although Ricky Naylor, the defendant's former cellmate at the MacDougall-Walker Correctional Institution, testified at trial that the defendant had admitted to him that he was involved in a ''robbery gone bad,'' he was armed with a gun, and three people died, Naylor's testimony differed from Parks' because, according to Naylor, the defendant did not take the gun away from the victim, but, rather, his ''cousins gave him a gun'' before he entered the apartment. Furthermore, unlike Parks, Naylor did not testify that the defendant admitted to firing his weapon or shooting his way out of the apartment. Therefore, we agree with the state that Parks' testimony contained key inculpatory facts not available through the testimony of any other witness.

State *v.* Lebrick

defendant explained that he escaped from the apartment by following behind some other men "as they shot their way out of the apartment."

Parks' testimony provided the state with crucial, inculpatory evidence regarding the defendant's role in the commission of the crimes—the defendant's confession that he intended to commit a robbery, was armed with a gun, and was one of the shooters. Given that "[a] defendant's confession is probably the most probative and damaging evidence that can be admitted against him"; (internal quotation marks omitted) *Arizona* v. *Fulminante*, 499 U.S. 279, 292, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991); we conclude that the first factor weighs in favor of the defendant. See, e.g., *State* v. *Lockhart*, 298 Conn. 537, 597, 4 A.3d 1176 (2010) ("confessions are such powerful forms of evidence" [internal quotation marks omitted]); *State* v. *Iban C.*, 275 Conn. 624, 645, 881 A.2d 1005 (2005) ("a confession, if sufficiently corroborated, is the most damaging evidence of guilt" [internal quotation marks omitted]).

Turning to the second factor, we note that the defendant was charged with extremely serious crimes— namely, felony murder, home invasion, conspiracy to commit home invasion, burglary in the first degree, attempt to commit robbery in the first degree, and assault in the first degree—and the penalties he faced were severe. The charge of felony murder alone carries a potential sentence of life imprisonment. See *State* v. *Adams*, 308 Conn. 263, 265, 63 A.3d 934 (2013) (holding that felony murder "is a class A felony and, therefore, is punishable by a term of imprisonment of twenty-five years to life"). In a case such as this one, "it is fair to ask more of the prosecution than in a situation involving significantly less serious consequences." *McCandless* v. *Vaughn*, supra, 172 F.3d 266. The second factor therefore favors the defendant.

State *v.* Lebrick

Although the third factor weighs in favor of the state because the record does not reflect that Parks ''receive[d] any consideration from the government for her testimony''; *United States* v. *Smith*, supra, 928 F.3d 1242; we conclude that the fourth factor, like the first two, favors the defendant. Given the crucial nature of Parks' testimony and the serious nature of the crimes charged, we cannot conclude that the state's efforts to locate Parks were ''as vigorous'' as they would have been ''if it ha[d] no preliminary hearing testimony to rely [on] in the event of 'unavailability.' '' *United States* v. *Lynch*, supra, 499 F.2d 1023. The state knew that Parks was a crucial and reluctant witness whose testimony at the probable cause hearing had to be procured by court order but nonetheless did not keep apprised of her whereabouts or begin searching for her until the end of August or beginning of September, 2014, shortly before jury selection began. See footnote 7 of this opinion. When Hightower began to try and locate Parks, his efforts were confined to a computer search of only three content limited electronic databases, each of which contained relatively narrow categories of information. Hightower did not use the most basic Google search engine to locate Parks or even attempt to access any of the most popular social media sites, such as Facebook. Although Hightower knew that Parks was a New York resident, he did not search any New York state governmental databases to look for routine information, such as motor vehicle, social service, housing court, family court, or child support records. He did not use the information in his possession about Parks' last known addresses to learn whether she owned her own home or had a landlord who might have knowledge of her whereabouts. Nor did he ever ask anyone else to pursue any of these basic avenues of inquiry.

Instead, Hightower conducted his investigation by searching three content limited databases available on

State *v.* Lebrick

his work computer. He began with the Hartford Police
Department's local in-house computer database, which,
unsurprisingly, yielded no results for Parks, a New York
resident. Hightower then turned his attention to two
national computer databases—NCIC and CLEAR. The
first, NCIC, contains only information about individuals
with prior criminal and/or arrest records. There is no
evidence that Parks had such a record, and this par-
ticularized search also failed to return any useful infor-
mation. The second database, CLEAR, contains differ-
ent types of information depending on the subscription
level purchased, and, although the subscription levels
beyond "basic" provide access to more robust informa-
tion, the state failed to present evidence establishing
what subscription level Hightower had used to search
for Parks. The evidence indicates that Hightower's
search did not encompass "detailed reports like . . .
lawsuits, liens, [and] judgments" or "social media infor-
mation."[14]

In the digital age, a vast amount of information is
"[nonterrestrial] and borderless," thus enabling the gov-
ernment "to do more, and to do it better, faster, and

_____

[14] We disagree with the dissenting opinion that the evidence supports a
reasonable inference that Hightower used a "nonbasic" subscription to
CLEAR to search for Parks. Although Hightower at one point testified that
he thought that CLEAR included "all public databanks . . . or any sort of
anything that has to do with a public domain," he later admitted that he
did not "know [the] specifics" of "how extensive" their databases are and
the types of information available. Tiernam, the CLEAR product specialist,
testified that CLEAR searches "detailed reports like . . . lawsuits, liens,
[and] judgments" or "social media information" only if the subscriber pur-
chases an enhanced subscription. There is no evidence in the record, much
less the substantial evidence required to meet the state's burden, to support
a reasonable inference that "the state . . . opted for the higher level sub-
scription to CLEAR," as the dissent posits. The trial court itself made no such
finding. To the contrary, our review of the record compels the conclusion
that Hightower's CLEAR search encompassed only basic location informa-
tion. See *State* v. *Mangual*, supra, 311 Conn. 197 (when defendant's constitu-
tional rights are at stake, reviewing court must "conduct a scrupulous
examination of the record . . . in order to ascertain whether, in light of
the totality of the circumstances, the trial court's finding is supported by
substantial evidence" [internal quotation marks omitted]).

State *v.* Lebrick

cheaper than before'' by conducting searches via computer rather than pounding the pavement to locate paper records, brick and mortar locations, and flesh and blood witnesses or informants. L. Donohue, ''The Fourth Amendment in a Digital World,'' 71 N.Y.U. Ann. Surv. Am. L. 553, 554 (2016). A vast amount of information can be accessed in a short amount of time using minimal physical effort. But this is true only if the proper electronic resources are used and the operator uses those resources properly. The efficacy of computer research necessarily is limited by the contents of the databases searched. In the present case, Hightower searched only three computer databases, two of which were of questionable value in locating a New York resident with no known criminal record, and the third of which we are compelled to conclude included only ''basic'' location information, such as credit headers and utility hookups. See footnote 14 of this opinion.

The on the ground efforts were equally anemic. Once Hightower acquired two possible addresses for Parks and one for her mother, he forwarded those addresses to Garguilo for service of the interstate summons. Hightower never spoke with Garguilo and made no request that Garguilo or anyone else in New York undertake any investigative efforts, knock on doors, talk with neighbors, locate a landlord, follow any leads, or conduct the most minimal surveillance. Garguilo visited the addresses only during normal working hours, when most people with a nine-to-five job would not be expected to be at home. Compare *Hardy* v. *Cross*, supra, 565 U.S. 68 (no confrontation clause violation when state visited witness' residence ''on numerous occasions, approximately once every three days, at different hours of the day and night''), with *United States* v. *Quinn*, supra, 901 F.2d 528 (government's efforts were insufficient to establish witness' unavailability because government visited her apartment only twice, talked to her apartment manager and neighbor, drove

State *v.* Lebrick

by her mother's house, and talked to her mother on phone). No follow-up was requested after Garguilo reported back regarding his lack of success, and no further efforts were made to locate Parks.

The minimal effort undertaken by the state does not qualify as diligent. If the state did not already have Parks' former testimony in hand, we consider it very unlikely that a supervisor would have accepted Hightower's efforts without requiring more. Although we do not doubt the sincerity of the state's efforts to secure Parks' attendance at trial, we nonetheless find ourselves firmly of the view, on this record, that the state's "unenthusiastic"; *United States* v. *Quinn,* supra, 901 F.2d 528; and "perfunctory" efforts are insufficient to meet the "relatively high good faith standard" of the confrontation clause. *United States* v. *Mann,* 590 F.2d 361, 367 (1st Cir. 1978); see id. (explaining that "perfunctory efforts" are insufficient under confrontation clause because, otherwise, prosecutorial authorities would have incentive to "discourage attempts to bring the witness to trial so long as the government is satisfied with what is in the transcript"). Because Parks was an important witness and the criminal charges against the defendant were of the most serious nature, "we are left with the firm conviction that the [state's] efforts to [ensure] [Parks'] presence would have been far less casual had the shoe been on the other foot. If the [state] had not had [Parks'] preliminary hearing testimony and had needed [Parks'] presence at trial, we are confident that the resources and effort devoted to finding [her] prior to trial would have been greater than they in fact were. To countenance such a disparity would ill serve the interests protected by the [c]onfrontation [c]lause." *McCandless* v. *Vaughn,* supra, 172 F.3d 269; see also *Cook* v. *McKune,* supra, 323 F.3d 840 (explaining that, "[i]f the [s]tate's feeble exertions" to procure the attendance of crucial witness in murder case "can be called a [good faith] effort," then "the [s]ixth [a]mendment protections . . . would be toothless").

State *v.* Lebrick

We cannot agree with the dissenting opinion that the state's efforts in this case were "solidly on the spectrum of those deemed to be reasonable and in good faith by Connecticut and federal courts." As we explained previously, the reasonableness of the state's efforts must be "evaluated with a sensitivity to the surrounding circumstances and the defendant's interest in confronting the absent witness." *McCandless* v. *Vaughn*, supra, 172 F.3d 266. In cases in which "a 'key' or 'crucial' witness' testimony is involved" and in which "the consequences of a conviction based on the absent witness' testimony are grave," "[c]onfrontation [c]lause concerns are heightened and courts insist on more diligent efforts by the prosecution . . . ." Id.; see also *United States* v. *Lynch*, supra, 499 F.2d 1023–24 (holding that government's efforts to find sole eyewitness to murder were not "as vigorous" as they would have been in absence of witness' prior testimony, even though witness was served with subpoena and detectives interrogated her grandmother and went to apartment at which she allegedly could be found multiple times); *Brooks* v. *United States*, supra, 39 A.3d 884 ("[t]he government's obligation to take steps to produce the witness ha[s] to correspond to the importance of the witness and the potential prejudice to the defendant if she [does] not testify"); *State* v. *Lee*, 83 Haw. 267, 279–80, 925 P.2d 1091 (1996) (state's "lackluster efforts" to find crucial witnesses to murder were insufficient to establish their unavailability under confrontation clause because, among other things, state failed to search for their "driver's license or motor vehicle registration" or show "any follow-up" after visit to one witness' last known address); *State* v. *Maben*, 132 N.J. 487, 503–504, 626 A.2d 63 (1993) (The state's "minimal search" efforts were insufficient to establish the unavailability of the child sexual assault victim because "[t]he [s]tate [neither] asked the post office whether the family had left a forwarding address, nor [asked] neighbors for the names of family members who might know of the family's location. The [s]tate

State *v.* Lebrick

never checked to see whether the mother, who had received welfare in New Jersey, had applied for benefits in Houston, [Texas] which was the logical place to check because prosecutors had an indication that the family had moved there . . . . [T]he [s]tate did not ask the Houston police for assistance in locating the family, other than to provide the police with one address.'' [Citation omitted.]). Although Hightower's efforts to locate Parks might have been sufficient to demonstrate her unavailability if her testimony had been peripheral in its importance or if the crimes charged had not been grave; see, e.g., *State* v. *Smith*, 112 Conn. App. 592, 603– 604, 963 A.2d 104 (state's efforts to find witness by visiting her home and calling her cell phone multiple times were sufficient to establish her unavailability when witness, who neither was present at time of shooting nor had any firsthand knowledge about it, testified only about victim's demeanor prior to shooting), cert. denied, 291 Conn. 912, 969 A.2d 176 (2009); *State* v. *Miller*, 56 Conn. App. 191, 195, 742 A.2d 402 (1999) (state's efforts to find witnesses by checking motor vehicle department records for their last known addresses and visiting those addresses prior to trial of defendant, who was charged with larceny and engaging in real estate business without license, were sufficient to establish witnesses' unavailability), cert. denied, 252 Conn. 937, 747 A.2d 4 (2000); the crucial nature of Parks' testimony and the severe crimes with which the defendant was charged ineluctably lead to the conclusion that the state must put forth a "greater . . . effort"; *Cook* v. *McKune*, supra, 323 F.3d 835; to secure Parks' attendance at trial.[15]

---

[15] Our conclusion is not predicated on "twenty-twenty hindsight," as the dissenting opinion suggests. Hindsight has no role in our analysis. Our conclusion is based instead on the facts and circumstances known or readily knowable to Hightower when he conducted his search. Hightower knew that Parks was a reluctant witness who resided in the state of New York, yet he never searched any New York state governmental databases, including its motor vehicle, family court, child support, or housing records. Hightower delegated the actual physical effort to serve process on Parks in New York

State *v.* Lebrick

For the foregoing reasons, we conclude that the state has failed to establish that it undertook a reasonable, diligent, and good faith effort to locate Parks prior to the defendant's trial, and, therefore, Parks' former testimony improperly was admitted in violation of the defendant's right of confrontation. We therefore reverse the judgment of the Appellate Court.

II

Although our conclusion in part I of this opinion that the defendant is entitled to a new trial disposes of this appeal, we address the merits of the defendant's second claim that the trial court improperly admitted the testimony of the state's expert witness on firearm and tool mark identification in violation of the defendant's sixth amendment right of confrontation because it is likely to arise on remand.[16] The following additional facts

entirely to Garguilo, but he never even spoke with Garguilo regarding the assignment and did not ask him to conduct any actual investigative work. When Hightower thereafter received word that Garguilo's efforts to serve Parks were unsuccessful, Hightower did not pursue any follow-up, for example, by asking Garguilo to return to the locations at a time outside of normal working hours. Hightower also failed to conduct basic Internet searches. It was common knowledge in 2014, as it is today, that publicly available websites such as Google and Facebook are valuable resources for locating individuals, and these resources were (and continue to be) used every day by tens of millions of people to locate everything and everyone from the nearest gas station to a long lost childhood friend. Yet Hightower did not use these tools to search for Parks. It is unknown whether any of these inquiries would have unearthed information leading to Parks' whereabouts, but it is not the defendant's burden to demonstrate that Hightower's efforts would have been successful. Instead, it is the state's burden to demonstrate that Hightower's efforts were reasonable under the circumstances. See, e.g., *Ohio* v. *Roberts*, supra, 448 U.S. 74–75 (under confrontation clause, "the prosecution bears the burden of establishing" that "the witness is unavailable despite [good faith] efforts undertaken prior to trial to locate and present that witness"). It is not hindsight to observe that numerous basic and obvious avenues of inquiry were left unpursued. Simply put, the state has failed to meet its burden of demonstrating that Hightower's efforts were reasonable in this case.

[16] "Ordinarily, we do not decide constitutional issues when resolving those issues is not necessary to dispose of the case before us. . . . We have made an exception to this rule, however, when an issue with constitutional implications that has been presented and briefed by the parties is likely to arise on remand." *In re Taijha H.-B.*, 333 Conn. 297, 312 n.9, 216 A.3d 601 (2019).

State *v.* Lebrick

and procedural history are relevant to our review of this claim.

One of the critical issues at trial was whether Barrett or the defendant had fired the projectile[17] that fatally wounded the victim. The state recovered various projectiles and casings from the scene of the crimes and submitted them to the state forensic laboratory for analysis. Gerard Petillo, a former employee of the state forensic laboratory, examined seven of these projectiles and casings, produced photographs, and generated a ballistic report containing his expert conclusions. Stephenson, who also was employed at the state forensic laboratory at that time, was the "technical reviewer" and "second signer" on Petillo's ballistic report. As part of his technical review, Stephenson physically examined four of the projectiles recovered from the scene of the crimes.

Petillo died prior to trial and, therefore, was unavailable to testify. The state sought to admit the in-court expert testimony of Stephenson in lieu of Petillo's ballistic report. The defendant moved to suppress Stephenson's in-court testimony, contending that it was inadmissible under the confrontation clause of the sixth amendment pursuant to *Bullcoming* v. *New Mexico*, 564 U.S. 647, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011), and *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), because it was predicated on Petillo's ballistic report, which the defendant claimed was testimonial hearsay. The state opposed the defendant's motion, arguing that, although Stephenson's expert opinions ultimately were "no different" than Petillo's, Stephenson had formed his own independent conclusions after reviewing all of the information available, including photographs, notes, and Petillo's report. The state argued that there was "no con-

---

[17] Stephenson explained that a projectile is a bullet that exits the cartridge case of the firearm during the firing process, leaving behind a casing.

State *v.* Lebrick

frontation issue'' because the defendant would be able to confront Stephenson and to cross-examine him regarding the basis of his expert opinions. The trial court agreed and denied the defendant's motion to suppress.

At trial, Stephenson testified that seven nine millimeter caliber cartridge cases and projectiles recovered from the scene of the shooting were submitted to the state forensic laboratory for examination. Stephenson explained that six of the seven cartridge cases ''had consistent rifling characteristics as being fired [from] the same firearm,'' whereas the seventh cartridge case, which was recovered near the victim's body, had been fired from a different firearm. Similarly, with respect to the projectiles, Stephenson testified that one of the seven projectiles—the one recovered from the victim's body—''was inconsistent'' and ''couldn't have come from the same barrel.'' During closing argument, the state emphasized the importance of Stephenson's testimony, arguing that it supported the state's theory that the bullet that killed the victim ''wasn't from [Barrett's] gun'' but, rather, was from the defendant's gun.

On appeal, the defendant contends that the trial court improperly admitted Stephenson's expert testimony in violation of his sixth amendment right of confrontation because his testimony was predicated on Petillo's ballistic report, which he argues is testimonial hearsay, and the defendant did not have a prior opportunity to cross-examine Petillo regarding his expert conclusions. The state responds that the record is inadequate to review the defendant's confrontation clause claim because neither Petillo's ballistic report nor the other materials ''reviewed by Stephenson in preparation for his testimony were . . . marked for identification or entered into evidence at trial,'' and, therefore, it cannot be determined whether they ''were, in fact, testimonial'' in nature. Alternatively, the state contends that there was no confrontation clause violation because Stephenson

State *v.* Lebrick

conducted his own independent review of the evidence, formulated his own expert opinion, and was available for cross-examination. The state also argues that, even if a confrontation clause violation occurred, any such violation was harmless beyond a reasonable doubt.

"Under *Crawford* v. *Washington*, supra, 541 U.S. 59, hearsay statements of an unavailable witness that are testimonial in nature may be admitted in accordance with the confrontation clause only if the defendant previously has had the opportunity to cross-examine the unavailable witness." *State* v. *Smith*, 289 Conn. 598, 618, 960 A.2d 993 (2008). "Nontestimonial statements, however, are not subject to the confrontation clause and may be admitted under state rules of evidence. . . . Thus, the threshold inquiries that determine the nature of the claim are whether the statement was hearsay, and if so, whether the statement was testimonial in nature, questions of law over which our review is plenary." (Citation omitted.) Id., 618–19.

We recently addressed the admissibility of expert testimony under the sixth amendment's confrontation clause in *State* v. *Walker*, 332 Conn. 678, 212 A.3d 1244 (2019). In *Walker*, we acknowledged that "expert witnesses . . . may base their testimony on information provided to them by other sources without their testimony necessarily being regarded as introducing hearsay." Id., 691; see also Conn. Code Evid. § 7-4 (b) ("The facts in the particular case upon which an expert bases an opinion may be those perceived by or made known to the expert at or before the proceeding. The facts need not be admissible in evidence if of a type customarily relied on by experts in the particular field in forming opinions on the subject."). "Accordingly, [w]hen the expert witness has consulted numerous sources, and uses that information, together with his own professional knowledge and experience, to arrive at his opinion, *that opinion is regarded as evidence in its own right and not as hearsay in disguise*." (Emphasis in

State *v.* Lebrick

original; internal quotation marks omitted.) *State* v. *Walker*, supra, 692.

''Nonetheless, the underlying information upon which the expert's opinion is based may not itself be admitted into evidence for its truth.'' Id.; see also Conn. Code Evid. § 7-4 (b) (''[t]he facts relied on [by the expert] pursuant to this subsection are not substantive evidence, unless otherwise admissible as such evidence''). ''Accordingly, the testimony of an expert witness improperly introduces hearsay when the out-of-court statements upon which it is based are themselves admitted into evidence to prove the truth of what they assert.'' *State* v. *Walker*, supra, 332 Conn. 692.

''In criminal cases, the admission of expert testimony that is based upon an out-of-court statement may implicate the confrontation clause if the underlying statement itself is testimonial. Acknowledging these concerns, courts have held that expert witnesses may base their opinions on the testimonial findings of other experts without violating the confrontation clause if those underlying findings are not themselves put before the jury. . . . On the other hand, where the testifying expert explicitly refers to, relies on, or vouches for the accuracy of the other expert's findings, the testifying expert has introduced out-of-court statements that, if offered for their truth and are testimonial in nature, are subject to the confrontation clause.'' (Citations omitted.) Id., 693–94. Thus, expert testimony is inadmissible under the confrontation clause if it is ''used as [a conduit] for the admission into evidence of the testimonial statements of others.'' Id., 695.

We applied these principles in *Walker* to determine whether the admission into evidence of the testimony and report of the state's expert witness on DNA, Heather Degnan, violated the sixth amendment right of confrontation of the defendant, Eugene L. Walker. Id., 680–81. Degnan personally tested a bandana found at

State *v.* Lebrick

the scene of the crime and determined that it contained
Walker's DNA, but her expert opinion was predicated
on a DNA profile for Walker generated, without her par-
ticipation, by the " 'known processing group.' " Id., 684.
Specifically, an analyst or analysts at the known pro-
cessing group had analyzed Walker's buccal swab and
generated a "known" DNA profile for Walker, which Deg-
nan then relied on to reach her conclusion that the DNA
found on the bandana belonged to Walker. Id. Degnan
"neither performed nor observed the analysis of the buc-
cal swab that produced [Walker's] DNA profile"; id., 681;
nor was there any evidence that she was provided with
"the raw machine data . . . ." Id., 696. Nonetheless, at
the defendant's trial, Degnan swore " 'to the accuracy'
of the DNA profile provided to her" and testified "that
the analyst or analysts who processed the known sam-
ples 'did it properly, followed standard operating proce-
dures.' " Id., 685–86.

We concluded in *Walker* that "Degnan's testimony at
trial necessarily introduced the out-of-court statements
of the known processing group and did not consist
merely of her own independent opinion." Id., 697.
Although "Degnan's testimony about the DNA profiles
she generated from the bandana was not hearsay
because she conducted these analyses herself," Degnan
"explicitly referred to, relied on, and vouched for the
quality of work that she did not perform and, in so
doing, relayed to the jury the known processing group's
out-of-court statements about [Walker's] numerical
DNA profile." Id. Additionally, "Degnan introduced the
known processing group's out-of-court statements by
including in her report, which was admitted into evi-
dence without limitation, the allele numbers comprising
[Walker's] DNA profile that the known processing group
had provided to her." Id., 697–98. Because the known
processing group's out-of-court statement regarding
Walker's DNA profile was offered for its truth, was hear-
say, and was testimonial in nature; id., 700; we held that
Degnan's expert testimony was admitted in violation of

State *v.* Lebrick

Walker's sixth amendment right of confrontation. Id., 719–20.

Pursuant to *Walker*, Stephenson's testimony was admissible, even if predicated in material part on testimonial hearsay, as long as the underlying hearsay was not admitted into evidence or otherwise put before the jury for the truth of the matter asserted. The record reflects that neither Petillo's ballistic report nor any of the statements or conclusions contained therein were admitted into evidence, either as an exhibit or through the conduit of Stephenson's live, in-court testimony. Although the jury was informed that Stephenson had reviewed "a number of reports and photographs in preparation for [his] testimony," the contents of those reports were not presented to the jury. When the state attempted to elicit information regarding "which reports [Stephenson had] reviewed," the defendant objected to this line of inquiry, and the trial court implicitly sustained the defendant's objection, ruling that Stephenson's testimony must be limited "to his own conclusions." Thus, the jury was not informed of the nature of the reports on which Stephenson had relied, who generated the reports, what information they contained, or whether Stephenson's expert opinions were consistent with the reports. On the record before us, we conclude that Stephenson applied "his training and experience to the sources before him and reach[ed] an independent judgment," the basis of which could be "tested through cross-examination."[18] *United States* v. *Johnson*, 587 F.3d 625, 635 (4th Cir. 2009), cert. denied sub nom. *Martin* v.

[18] The defendant claims that Stephenson's expert testimony is inadmissible pursuant to *State* v. *Buckland*, 313 Conn. 205, 96 A.3d 1163 (2014), cert. denied, 574 U.S. 1078, 135 S. Ct. 992, 190 L. Ed. 2d 837 (2015), because the state failed to produce the live in-court testimony of "the person who performed the test . . . ." We disagree. In *Buckland*, the defendant claimed that the results of his breath alcohol test improperly were admitted under the confrontation clause because "the state did not produce four witnesses regarding the [Breathalyzer] machine and its calibration . . . ." Id., 211. We rejected the defendant's claim because, among other reasons, the "live presence" of "both the person who performed the test . . . and an expert to explain the results" satisfied the requirements of the confrontation clause.

State *v.* Lebrick

*United States*, 559 U.S. 1082, 130 S. Ct. 2128, 176 L. Ed. 2d 749 (2010). "Where, as here, expert witnesses present their own independent judgments, rather than merely transmitting testimonial hearsay, and are then subject to cross-examination, there is no [c]onfrontation [c]lause violation." Id., 636; see also *Bullcoming* v. *New Mexico*, supra, 564 U.S. 673 (Sotomayor, J., concurring in part) (concluding that admission of expert report violated confrontation clause but noting that "[w]e would face a different question if asked to determine the constitutionality of allowing an expert witness to discuss others' testimonial statements if the testimonial statements were not themselves admitted as evidence"); *United States* v. *Mejia*, 545 F.3d 179, 198 (2d Cir. 2008) ("the question under *Crawford* is whether the expert applied his expertise to those [testimonial] statements but did not directly convey the substance of the statements to the jury" [internal quotation marks omitted]); *State* v. *McLeod*, 165 N.H. 42, 53, 66 A.3d 1221 (2013) ("the [c]onfrontation [c]lause is not violated when an expert testifies regarding his or her independent judgment, even if that judgment is based [on] inadmissible testimonial hearsay"); *State* v. *Griep*, 361 Wis. 2d 657, 682–83, 863 N.W.2d 567 (2015) (no confrontation clause violation when nontestifying analyst's "testimonial forensic report is not admitted and the expert witness who testifies at trial gives his or her independent opinion after review of laboratory data"), cert. denied,      U.S.      , 136 S. Ct. 793, 193 L. Ed. 2d 709 (2016).

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to remand the case to the trial court for a new trial.

In this opinion PALMER, McDONALD and D'AURIA, Js., concurred.

Id., 216. *Buckland* is distinguishable from the present case because Stephenson did not explain the results of a test performed by an out-of-court declarant; instead, he testified about the results of his own independent analysis of the available information. Accordingly, the defendant's reliance on *Buckland* is misplaced.

State *v.* Lebrick

ROBINSON, C. J., with whom MULLINS, J., joins, concurring in part and dissenting in part. I respectfully disagree with part I of the majority opinion, in which the majority concludes that the state did not engage in a diligent, reasonable, and good faith effort to procure the in-court testimony of a witness, Keisha Parks, at the trial at which the defendant, Horvil F. Lebrick, was convicted of, inter alia, felony murder and home invasion. Given this conclusion, the majority holds that the Appellate Court improperly upheld the trial court's determination that Parks was an unavailable witness and that the admission of her testimony from the defendant's probable cause hearing did not violate the confrontation clause of the sixth amendment to the United States constitution. See *State* v. *Lebrick*, 179 Conn. App. 221, 235–36, 178 A.3d 1064 (2018). In my view, the majority relies on twenty-twenty hindsight to conclude that the state's efforts to find Parks, which utilized comprehensive online resources and on the ground assistance from an investigator with the Kings County District Attorney's Office to look for her at several potential addresses in two boroughs of New York City, were not reasonable. Because I would affirm the judgment of the Appellate Court upholding the judgment of conviction, I respectfully dissent.[1]

By way of background, I agree with the majority's statement of the relevant facts and procedural history. I also agree with the general principles of law stated by the majority, along with its conclusion in part I A of its opinion that whether a witness is unavailable for confrontation clause purposes presents a mixed question of law and fact subject to plenary review.[2] "The

[1] I agree with part II of the majority opinion, in which the majority concludes that the admission of the testimony of James Stephenson, the state's expert witness on firearm and tool mark identification, did not violate the confrontation clause.

[2] In the absence of confrontation clause concerns, for evidentiary purposes under § 8-6 of the Connecticut Code of Evidence, "[t]he trial court has broad discretion in determining whether the proponent has shown a declarant to

State *v.* Lebrick

[s]ixth [a]mendment's [c]onfrontation [c]lause provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' . . . Most of the time, this means that a witness must appear in person and give live testimony at trial if her statements are to be used against the defendant. . . .

"The defendant's right to a [witness'] live testimony in the courtroom serves many important purposes, including allowing the jury to observe closely the [witness'] demeanor, expressions, and intonations, and thereby determine the [witness'] credibility. . . . The [United States] Supreme Court has emphasized that in-court confrontation not only allows the defendant to test the [witness'] recollection, but also compels the witness 'to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.' . . .

"Of course, the [United States] Supreme Court has also told us that the right to a [witness'] presence at trial is not absolute. In [*Crawford* v. *Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)], the Supreme Court expressly held that the testimony of a witness who does not appear at trial is still admissible, in the constitutional sense, if these two conditions are met: (1) the witness 'was unavailable to testify'; and (2) 'the defendant had had a prior opportunity for cross-examination.' . . . Accordingly, prior cross-examination alone cannot substitute for the defendant's right to live testimony in the courtroom unless the witness meets the [c]onfrontation [c]lause's requirement of 'unavailability.' . . . The integrity of the fact-finding process is at stake because the [c]onfrontation [c]lause

be unavailable. Only upon a showing of a clear abuse of discretion will this court set aside on appeal rulings on evidentiary matters." (Internal quotation marks omitted.) *State* v. *Rivera*, 221 Conn. 58, 62, 602 A.2d 571 (1992).

State *v.* Lebrick

is a procedural protection.'' (Citations omitted.) *United States* v. *Smith*, 928 F.3d 1215, 1226–27 (11th Cir. 2019), cert. denied, 88 U.S.L.W. 3225 (U.S. January 13, 2020) (No. 19-361); see, e.g., *State* v. *Kirby*, 280 Conn. 361, 364 n.1, 908 A.2d 506 (2006) (''[t]he confrontation clause of the sixth amendment is made applicable to the states through the due process clause of the fourteenth amendment'' [internal quotation marks omitted]).

Consistent with the constitutional restrictions under *Crawford*, § 8-6 (1) of the Connecticut Code of Evidence[3] allows for the admission of the ''prior testimony of an *unavailable* witness . . . in a subsequent trial as an exception to the hearsay rule. . . . The two part test for the admissibility of such testimony is as follows: First . . . [t]he prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant. . . . Even after the declarant is satisfactorily shown to be unavailable, his statement is admissible only if it bears adequate indicia of reliability . . . which serve to afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement. . . .

''In *State* v. *Frye*, 182 Conn. 476, 480–81, 438 A.2d 735 (1980), we identified five of the most common situations in which the declarant will be deemed unavailable for the purposes of certain hearsay exceptions. The situation relevant here states: the declarant is absent from the hearing and the proponent of his statement has been unable to procure his attendance . . . *by pro-*

---

[3] Section 8-6 of the Connecticut Code of Evidence provides in relevant part: ''The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

''(1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, provided (A) the issues in the former hearing are the same or substantially similar to those in the hearing in which the testimony is being offered, and (B) the party against whom the testimony is now offered had an opportunity to develop the testimony in the former hearing. . . .''

State *v.* Lebrick

*cess or other reasonable means.* . . . In interpreting reasonable means, we have held that the proponent must exercise due diligence and, at a minimum, make a good faith effort to procure the declarant's attendance.'' (Citations omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) *State* v. *Rivera*, 221 Conn. 58, 61–62, 602 A.2d 571 (1992); see, e.g., *Hardy* v. *Cross*, 565 U.S. 65, 69, 132 S. Ct. 490, 181 L. Ed. 2d 468 (2011); *Ohio* v. *Roberts*, 448 U.S. 56, 74, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), overruled on other grounds by *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); *Barber* v. *Page*, 390 U.S. 719, 724–25, 88 S. Ct. 1318, 20 L. Ed. 2d 255 (1968); *State* v. *Wright*, 107 Conn. App. 85, 89–90, 943 A.2d 1159, cert. denied, 287 Conn. 914, 950 A.2d 1291 (2008).

''To take advantage of the hearsay exceptions requiring unavailability, the proponent must show a good faith, genuine effort to procure the declarant's attendance by process or other reasonable means. . . . This showing necessarily requires substantial diligence. In determining whether the proponent of the declaration has satisfied this burden of making reasonable efforts, the court must consider what steps were taken to secure the presence of the witness and the timing of efforts to procure the declarant's attendance.'' (Citations omitted.) *State* v. *Lopez*, 239 Conn. 56, 75, 681 A.2d 950 (1996). ''A proponent's burden is to demonstrate a diligent and reasonable effort, not to do everything conceivable, to secure the witness' presence.'' Id., 77–78; accord *State* v. *Wright*, supra, 107 Conn. App. 90. ''[T]here is no [bright line] rule for reasonableness, and . . . a reasonableness inquiry necessarily is [fact specific] and examines the totality of the factual circumstances of each particular case.'' *United States* v. *Smith*, supra, 928 F.3d 1228; see, e.g., *Cook* v. *McKune*, 323 F.3d 825, 835 (10th Cir. 2003) (noting that there is no ''per se rule defining the measures that the prosecution

334 Conn. 492 JANUARY, 2020 533

State *v.* Lebrick

must take before a witness can be deemed unavailable''
[internal quotation marks omitted]). ''Simply put, the
[c]onfrontation [c]lause does not require the govern-
ment to make every conceivable effort to locate a wit-
ness; it requires only a [good faith] effort that is
reasonable under all of the circumstances of the case.
. . . As the [United States] Supreme Court has told us,
[o]ne, in hindsight, may always think of other things.
. . . [G]reat improbability that such efforts would have
resulted in locating the witness, and would have led to
her production at trial, neutralizes any intimation that
a concept of reasonableness required their execution.''
(Citations omitted; internal quotation marks omitted.)
*United States* v. *Smith*, supra, 1230. ''At bottom, a rea-
sonable, [good faith] effort is [case specific] and contex-
tually driven.'' Id.

As the majority explains, four factors guide the deter-
mination of whether the state's efforts to procure the
attendance of the witness were reasonable, namely
(1) ''the more crucial the witness, the greater the effort
required to secure his attendance,'' (2) ''the more seri-
ous the crime for which the defendant is being tried, the
greater the effort the [state] should put forth to produce
the witness at trial,'' (3) ''where a witness has special
reason to favor the prosecution, such as an immunity
arrangement in exchange for cooperation, the defen-
dant's interest in confronting the witness is stronger,''
and (4) whether the state made ''the same sort of effort
to locate and secure the witness for trial that it would
have made if it did not have the prior testimony avail-
able.'' *Cook* v. *McKune*, supra, 323 F.3d 835–36. In my
view, these factors reflect the prosecutor's important
role as a ''minister of justice''; Rules of Professional Con-
duct 3.8, commentary; who is ''not only an officer of the
court, like every attorney, but is also a high public officer,
representing the people of the [s]tate, who seek impartial
justice for the guilty as much as for the innocent.'' (Inter-
nal quotation marks omitted.) *State* v. *Medrano*, 308
Conn. 604, 612, 65 A.3d 503 (2013).

State *v.* Lebrick

I agree with the majority that Parks was a critical witness to the state's case because, as the fiancée of one of the defendant's accomplices, she would have testified to the defendant's confession that he kicked in the door to the apartment, disarmed the victim, and shot his way out. It is beyond cavil that the defendant was charged with extremely serious crimes, including felony murder and home invasion, which left him exposed to a life sentence. I also agree that Parks had no special reason to favor the prosecution, insofar as there is no indication that she stood to benefit personally from testifying in this case.

I part company from the majority with respect to its analysis of the fourth factor, which considers the reasonableness of the search in light of the efforts that the state would have made if it did not have Parks' prior testimony available. In contrast to the majority's view of the state's efforts, my review of the record leads me to conclude that the state's efforts were competent and reasonable rather than perfunctory and inadequate. Emory L. Hightower, the inspector with the state's criminal justice division in the Hartford state's attorney's office who was tasked with finding Parks, commenced his efforts at the end of August, 2014, approximately two months prior to the defendant's trial. Hightower began his investigation by reviewing police reports and memoranda in the state's case file for Parks' contact information, and he unsuccessfully called the telephone numbers contained in the file. He then searched for Parks in the local Hartford police database to determine whether she had had some "police contact" locally, and he also searched for her in the National Crime Information Center (NCIC) database, which is maintained by the Federal Bureau of Investigation but run locally by the Connecticut State Police and contains criminal and motor vehicle records. Hightower's criminal records searches also included searches for pending matters and other police contacts in both Connecticut and Parks' home state of New York. These searches were unsuccessful.

334 Conn. 492 JANUARY, 2020 535

State *v.* Lebrick

With his criminal records searches bearing no fruit, Hightower then utilized the CLEAR database system, which is a search engine provided by the Thomson Reuters Corporation that searches public records on a state by state basis. As explained by Erin Tiernam, a CLEAR product specialist employed by the Thomson Reuters Corporation, CLEAR is a "data aggregator" that pulls from numerous public records "to search for people, to [perform] due diligence on people, [and to] get detailed background information, those types of things." In connection with a "person search," CLEAR uses a person's name and date of birth to locate them via credit header information from credit reporting agencies, utility hookups for cable, gas, and electric services, death records, civil court records, property records, and motor vehicle registrations.[4] Hightower

[4] I disagree with the majority's assertion that "[t]he evidence indicates that Hightower's [CLEAR] search did not encompass 'detailed reports like lawsuits, liens, [and] judgments' or 'social media information' " because there is no specific evidence as to which CLEAR subscription level was available to Hightower. This criticism is not supported by the record. First, although Tiernam testified that she did not know which subscription level the state had purchased in this case, she also stated that CLEAR's "basic" subscription level "includes what we would call our location services, which would include all the credit headers, utility hookups, kind of *the finding people information*," with the second level providing "more detailed reports like . . . lawsuits, liens, judgements, [and] criminal records." (Emphasis added.) Second, consistent with Tiernam's description of CLEAR, Hightower testified that, on the basis of his training and experience, he understood CLEAR to "[list] any public document" and to provide access to the data contained therein about civil proceedings, such as information about public assistance and child support benefits. This evidence supports an inference that the state—even in these challenging fiscal times—opted for the higher level subscription to CLEAR.

I acknowledge, however, that there were several electronic sources that Hightower was unable to search. Although Hightower had access to credit headers via CLEAR, he did not have access to the underlying credit reports or—in the absence of a subpoena—to banking records. He also did not have access to Facebook or other social media sites from his office computer, and it is not apparent from the record whether the state's subscription to CLEAR included the "web analytic search" function, which, according to Tiernam, searches items such as "Facebook pages, LinkedIn pages, and also just somebody's general presence on the web."

State *v.* Lebrick

testified that his CLEAR search revealed contact information for Parks in New York that was current through 2013, the year before trial, including several telephone numbers and addresses.

Moving offline, Hightower turned to the New York addresses and telephone numbers that he had found via his CLEAR search. He called the numbers and learned that they were either no longer in service or no longer receiving calls. Hightower learned that Parks' last known address was an apartment located at 819 East 22nd Street in Brooklyn, New York, that her address before that was an apartment at 108–09 159th Street in the Jamaica neighborhood of Queens, New York, and that her mother lived in an apartment at 1169 Flatbush Avenue in Brooklyn.[5] Hightower then forwarded the addresses and telephone numbers to the Office of the Kings County District Attorney, which sent one of its investigators, Frank Garguilo, to locate Parks at those addresses and to serve her with a subpoena.

At 12:30 p.m. on Thursday, September 25, 2014, Garguilo went to the first Brooklyn address, 819 East 22nd Street, and discovered a large house divided into several apartments. He testified that a young woman from an upstairs apartment let him into the building, and he knocked on the door of the apartment believed to belong to Parks, receiving no answer. Garguilo then went back to his car and called one of the provided telephone numbers, getting a voicemail recording belonging to a "Miriam Augustine." He then left a voice mail

Finally, Hightower also testified that there was no national database that he could access that would allow him to see whether Parks was receiving federal public benefits or payments from the Internal Revenue Service. Hightower also did not inquire with immigration authorities; he testified that he did not know whether Parks was Jamaican, like the defendant and other individuals involved in the case.

[5] Hightower testified that he did not know whether Parks owned or rented her residences at those locations, and he did not do any additional research to determine whether she had a landlord.

State *v.* Lebrick

message but received no return call. Garguilo then drove to 1169 Flatbush Avenue, another Brooklyn address that Hightower identified as belonging to Parks' mother. Garguilo knocked on that door and found no one home. Later that day, at approximately 5 p.m., Garguilo returned to the East 22nd Street address and again checked unsuccessfully for Parks.

The following morning, Friday, September 26, 2014, Garguilo made a third visit to the East 22nd Street address, which was similarly unsuccessful. That morning, he also tried calling the telephone number again, but he received the same voicemail recording. He then attempted to locate Parks by driving to the secondary address that Hightower had provided in the Jamaica section of Queens; that address was for another large single family home that had been divided into apartments. Garguilo testified that no one was home in any of those apartments. Garguilo further testified that no one had answered the door at any of the locations that he had visited, leaving him unable to request more information from neighbors, which is his ordinary practice when looking for someone. Garguilo testified that his approach also was consistent with the policy directive of the Kings County District Attorney's Office, which was to follow the information provided by the agency that had requested assistance rather than to conduct an independent investigation.

I conclude that the efforts undertaken by the state through Hightower's investigation, which started online and finished with Garguilo's on the ground efforts in Brooklyn and Queens, are solidly on the spectrum of those deemed to be reasonable and in good faith by Connecticut and federal courts.[6] See, e.g., *State* v. *Rivera*, supra, 221 Conn. 62–67 (trial court did not abuse

---

[6] The reasonableness of the state's efforts is also supported by on point case law from our sister states. See, e.g., *People* v. *Valencia*, 43 Cal. 4th 268, 292–93, 180 P.3d 351, 74 Cal. Rptr. 3d 605 (finding good faith efforts to locate helpful, but not critical, witness when investigator started search

State *v.* Lebrick

its discretion in determining that state had demon-
strated that two witnesses who had left Connecticut

several months before trial, called telephone number witness had provided in
police report, attempted to obtain new telephone number through telephone
company, checked addresses contained in motor vehicles records and spoke
to persons at those addresses, and reviewed criminal, credit, real estate,
and civil court records), cert. denied, 555 U.S. 891, 129 S. Ct. 198, 172 L.
Ed. 2d 158 (2008); *Berkman* v. *State*, 976 N.E.2d 68, 76–77 (Ind. App. 2012)
(efforts were reasonable when state, which learned that witness had left
Indiana for Florida while attempting to serve him with subpoena, believed
that witness was evading existing arrest warrants in Indiana and was unable
to contact him by telephone, even though state did not send investigator
to Florida because record did not reflect that state had possible address
for witness there), transfer denied, 984 N.E.2d 221 (Ind.), cert. denied, 571
U.S. 863, 134 S. Ct. 155, 187 L. Ed. 2d 109 (2013); *Commonwealth* v. *Robinson*,
451 Mass. 672, 675–77, 888 N.E.2d 926 (2008) (commonwealth engaged in
good faith efforts to locate witness, despite failure to search for him in New
Jersey where he reportedly had gone without leaving address or telephone
number, because he had outstanding arrest warrants in Massachusetts and
would be unlikely to return voluntarily, and investigators had checked other
potential addresses for him in Massachusetts and Rhode Island); *State* v.
*Trice*, 292 Neb. 482, 486, 495, 874 N.W.2d 286 (2016) (efforts to serve out
of state witness were reasonable when they "began well in advance of
trial and continued up to the time of trial" and involved "considerable
coordination with [out of state] authorities," who had visited witness'
address and learned from his parents only that he had left Nebraska, with
no other information about his location provided); *State* v. *Bailey*, 163 N.C.
App. 84, 91, 592 S.E.2d 738 (finding good faith efforts from evidence that
"law enforcement officers tried to subpoena [the witness] at the address
they were given, and called several phone numbers [for him] provided by"
another witness), appeal dismissed, 358 N.C. 733, 601 S.E.2d 861 (2004);
*State* v. *Brown*, 744 A.2d 831, 835–37 (R.I. 2000) (state engaged in good faith
search for previously cooperative, subpoenaed witness who failed to appear
for trial when police from two towns unsuccessfully searched for him at
addresses where he might have been staying, repeatedly paged witness,
inquired of family members and neighbors, and checked hospitals and deten-
tion facilities throughout state); *State* v. *Jones*, 568 S.W.3d 101, 129–30
(Tenn.) (state made good faith effort to find critical witness in capital
homicide case by contacting multiple jurisdictions in Florida, where witness
was believed to be living, publishing his photograph in Florida newspaper,
and, after obtaining his telephone number from his mother, calling witness,
who indicated that he would not return to Tennessee to testify), cert. denied,
     U.S.    , 140 S. Ct. 262, 205 L. Ed. 2d 144 (2019); *State* v. *Garner*, Docket
No. 2016AP2201-CR, 2018 WL 1837088, *3–5 (Wis. App. April 17, 2018) (state
made reasonable efforts to locate witness, who had fled her pretrial services
program after testing positive for drugs, because she had willingly testified
at first trial and had given no indication that she would not testify at second
trial, and multiple police investigative units conducted local searches for
her over four days, including checking with her grandmother and following
up on leads suggested by defense counsel and witness' own attorney), review
denied, 383 Wis. 2d 624, 918 N.W.2d 431 (2018).

State *v.* Lebrick

for Massachusetts and Puerto Rico were unavailable
for trial when state's investigator, with assistance from
numerous out of state agencies, used criminal, correc-
tions, and labor department databases to discover wit-
nesses' aliases and identification numbers, and state's
failure to contact one of witness' brothers was not
unreasonable because it might have narrowed invest-
igation but would not "necessarily have found her");
*State* v. *Smith*, 112 Conn. App. 592, 596–98, 963 A.2d 104
(finding good faith, reasonable, and diligent effort when
state's inspector called home of nonappearing wit-
ness who resided in judicial district and received mes-
sage that number was not in service, left unreturned
messages over multiple days on her cell phone "at vary-
ing hours of the day and evening," and visited her home
twice and place of employment once, where her boss
indicated that she could not reach her), cert. denied,
291 Conn. 912, 969 A.2d 176 (2009); *State* v. *Wright*,
supra, 107 Conn. App. 91 (good faith, reasonable and
diligent effort when state's inspector looked for witness
over nine days, reviewed databases with driver's license
and motor vehicle information, checked national and
local civil and criminal databases, identified witness'
social security number, and physically visited all
addresses in Bridgeport and New Haven found in
searches for witness, his mother, and his brother); *State*
v. *Miller*, 56 Conn. App. 191, 194–95, 742 A.2d 402 (1999)
(unavailability of witnesses "satisfactorily proved"
when investigator checked witnesses' addresses with
motor vehicles department, visited those addresses two
weeks before trial, and learned from individuals at those
addresses that witnesses had all moved out of state),
cert. denied, 252 Conn. 937, 747 A.2d 4 (2000); *State* v.
*Sanchez*, 25 Conn. App. 21, 24–25, 592 A.2d 413 (1991)
(reasonable good faith efforts to locate juvenile witness,
who had been ordered transported to airport for flight
to Puerto Rico upon her release from custody, when
state contacted investigator for juvenile court from pub-

State *v.* Lebrick

lic defender's office and juvenile division probation officer, probation office did not know witness' whereabouts, and investigator unsuccessfully attempted to contact witness' out of state grandmother both by telephone and through welfare office); see also *Hardy* v. *Cross*, supra, 565 U.S. 67–71 (state's efforts to secure presence of missing sexual assault victim were reasonable when investigators visited her home every three days at different times, visited and interviewed her relatives and former boyfriend's family, and checked local hospitals, jails, medical examiner, immigration, and post office, and state's failure to check with her friends or current boyfriend was not unreasonable because persons interviewed earlier provided no reason to think that those individuals would have information about witness' whereabouts); *United States* v. *Smith*, supra, 928 F.3d 1229–31 (government made good faith efforts to locate undocumented immigrant witness, who had been mistakenly released from custody and had fled from jurisdiction of trial court, by having immigration agents search address that she previously had provided, contacting attorney who had represented her on material witness complaint, and trying to communicate with her by calling and sending text messages to her boyfriend's cell phone); *Evans* v. *Lindsey*, Docket No. 19-1394, 2019 WL 3214661, *3 (6th Cir. July 10, 2019) (state court reasonably concluded that witness was unavailable when, after testifying at preliminary hearing, "[the detective] personally served [her] at her residence with a subpoena for trial," she appeared in person for first day of trial but then "expressed fear about testifying and thereafter refused to answer or respond to [the detective's] numerous phone calls and voicemails," and detective went to her "residence multiple times, and checked another address, but was unable to locate [the witness]," whose husband "indicated that [she] was afraid and had left without stating where she was going," even though detective did not check "other loca-

State *v.* Lebrick

tions, such as hospitals and jails''); *Acosta* v. *Raemisch*, 877 F.3d 918, 929–31 (10th Cir. 2017) (state court reasonably concluded that prosecution engaged in good faith efforts to produce witness at trial when investigator visited her last known addresses, checked with post office to see whether she had filed change of address form, "obtained information from 'various sources' indicating [that the witness] had no permanent residence, lived on the streets, and was in hiding to avoid testifying,'' and engaged assistance from other investigative units, despite state's failure to contact relatives other than her grandfather or to check arrest records, which would have revealed recent arrest), cert. denied, U.S. , 139 S. Ct. 321, 202 L. Ed. 2d 220 (2018); *Young* v. *Grace*, 525 Fed. Appx. 153, 156–59 (3d Cir. 2013) (state court reasonably concluded that state police detective made good faith effort to find witness by going to his last known address several times, speaking with his sister, and checking in with numerous local law enforcement agencies, post office, welfare department, and department of motor vehicles), cert. denied sub nom. *Young* v. *Bickell*, 571 U.S. 1241, 134 S. Ct. 1499, 188 L. Ed. 2d 382 (2014); *Mermer* v. *McDowell*, Docket No. CV 16-932-VAP(E), 2016 WL 5329623, *19–22 (C.D. Cal. August 15, 2016) (reasonable efforts when detectives engaged assistance from multiple law enforcement agencies in region, checked multiple databases, continuously monitored arraignments, visited and surveilled home of witness' father, and went to three other locations where witness had been seen), report and recommendation accepted and adopted, 2016 WL 5329560 (C.D. Cal. September 21, 2016).

I respectfully disagree with the majority's criticisms of the state's online and on the ground efforts as "anemic,'' "perfunctory,'' and "unenthusiastic,'' and, therefore, insufficient to satisfy the good faith and reasonableness standards required by the confrontation clause. The state's efforts in this case bear none of

State *v.* Lebrick

the hallmarks that courts have deemed unreasonable, namely, a complete dereliction of the duty to search, refusing to follow unmistakably obvious leads, or failing to react to obvious warning signs that a witness intended to disappear. Beyond cases featuring a complete absence of an effort to search,[7] a paradigmatic example of an unconstitutionally low effort is found in *Brooks* v. *United States*, 39 A.3d 873 (D.C. 2012), in which the District of Columbia Court of Appeals deemed unreasonable the government's efforts to find a witness who had fled from the courthouse prior to testify-

---

[7] See, e.g., *Barber* v. *Page*, supra, 390 U.S. 720, 723–25 (state "made absolutely no effort" to bring witness to testify in person, despite knowledge that witness was in federal prison approximately 200 miles away); *Earhart* v. *Konteh*, 589 F.3d 337, 345–46 (6th Cir. 2009) (unreasonable efforts when state did not seek to compel attendance of minor witness at sexual assault trial, "even though it knew exactly where [she] was," namely, on vacation with her family, which constituted "complete lack of effort"), cert. denied, 562 U.S. 874, 131 S. Ct. 178, 178 L. Ed. 2d 107 (2010); *Jackson* v. *Brown*, 513 F.3d 1057, 1083–84 (9th Cir. 2008) (search for one witness was not diligent when detective made no effort to locate him until several weeks into trial because "he was 'too busy and he hadn't had really any time to check it out,' " but search was diligent as to second witness, who had been subpoenaed prior to trial and then released from custody, when officer "repeatedly checked" to see if she had been rearrested "under any of her aliases" and repeatedly visited "the street corner where she was allegedly working . . . to no avail"); *Whelchel* v. *Washington*, 232 F.3d 1197, 1209 (9th Cir. 2000) (state made no effort to seek attendance of witness who was being transferred out of state by his employer); *United States* v. *Mann*, 590 F.2d 361, 367–68 (1st Cir. 1978) (finding no good faith efforts when government misused rule 15 [a] of Federal Rules of Criminal Procedure by allowing key witness, who was juvenile Australian citizen, to leave Puerto Rico for Australia); *Abreu* v. *State*, 804 So. 2d 442, 444 (Fla. App. 2001) (finding that "the state made no effort to secure [the witness'] attendance at trial" despite its awareness that "[the witness] may have been reluctant to attend the second trial because he did not care for his earlier hotel accommodations"), aff'd, 837 So. 2d 400 (Fla. 2003); *State* v. *Nobles*, 357 N.C. 433, 441, 584 S.E.2d 765 (2003) ("the present record does not demonstrate that [the witness] was even contacted for purposes of determining her availability to testify at [the] defendant's capital sentencing proceeding"); *State* v. *Workman*, 171 Ohio App. 3d 89, 95–96, 869 N.E.2d 713 (2007) (single attempt to serve local witness with subpoena at her home on morning of trial, with no other evidence offered about witness' unavailability or state's efforts to locate her, was not diligent effort).

State *v.* Lebrick

ing at trial. Id., 879. Although the government had tried
"overnight, unsuccessfully, to contact her through fam-
ily and former addresses'' and called local hospitals
and jails the next day, the court deemed these efforts
unreasonable on the basis of its assumption that the
witness was likely still in the vicinity. Id., 887. The
court emphasized that the prosecutor had rejected the
suggestion of defense counsel and *specifically refused*
to check in neighboring Virginia, where the witness had
been arrested in the past, or to contact her attorney
for assistance, even though she had expressly stated to
the prosecutor that "she needed to see her lawyer dur-
ing the lunch break . . . . Instead, the prosecutor
declared he had 'no expectation' that she could be
found.'' Id., 888. The court observed that "[w]hat the
situation demanded . . . was an intensification of
efforts, a [doubling down], to search for and locate
the witness, even if it required more than an overnight
continuance of the trial. In short, this is unlike prior
cases, in which we have held that in the absence of
evidence that there was any possibility of locating [the
missing witness], no matter how remote, we cannot say
that the government failed to meet its good faith effort
requirement.'' (Internal quotation marks omitted.) Id.
The court stated that, although it was "mindful that the
government can face real challenges in dealing with
witnesses who may be unwilling to testify for any num-
ber of reasons, some of them understandable and com-
pelling,'' the "government's efforts were pro forma and
plainly inadequate in light of [the witness'] demon-
strated reluctance and her importance to the govern-
ment's case. It is difficult to imagine, in this prosecution
dependent on a sole eyewitness, that this lackadaisical
approach was equally as vigorous as that which the
government would [have] undertake[n] to prevent [the
witness] from disappearing had it not had her prior
testimony. . . . We can only infer that the govern-

State *v.* Lebrick

ment's vigilance had relaxed and only minimal steps were taken to present her live testimony at [the] appellant's second trial once [the witness'] prior testimony was in hand. . . . [Half measures] do not satisfy . . . the [c]onfrontation [c]lause or the evidentiary requirement that the witness be unavailable before prior recorded testimony may be admitted.'' (Citations omitted; internal quotation marks omitted.) Id.

Other cases holding efforts to locate a witness to be unreasonable involve similarly perfunctory efforts that consist of nothing more than going through the motions, with a record showing promising stones left unturned. See, e.g., *Cook* v. *McKune*, supra, 323 F.3d 825, 836–40 (finding state's efforts to locate witness, who was ''vital'' to first degree murder trial and who had received immunity from prosecution, to be unreasonable, ''perfunctory,'' and lacking good faith when state had engaged in ''heroic'' efforts to contact witness while he was hitchhiking in California and Mexico before receiving his former testimony but relied on ''gentlemen's agreement'' to have him return for trial and declined to pay his travel expenses in advance, despite knowing that he was ''nomadic'' and indigent, and refused to charge him with aiding and abetting after he failed to appear); *United States* v. *Quinn*, 901 F.2d 522, 528 (6th Cir. 1990) (finding government's efforts to locate critical witness, who lived locally, to be ''negligible'' and ''singularly unenthusiastic'' when search was initiated on Thursday before Monday trial, government presented no evidence that it checked public records or attempted to find forwarding address after being told by witness' neighbor that she recently had moved, and, after being informed that witness was at her mother's house, United States marshal merely drove by without stopping); *People* v. *Cromer*, 24 Cal. 4th 889, 903–904, 15 P.3d 243, 103 Cal. Rptr. 2d 23 (2001) (unreasonable efforts when state did not begin to seek witness, who had been reported to have disappeared months before,

State *v.* Lebrick

until just before trial, visited her former residence several times, and, after receiving tip that witness was living locally with her mother, delayed for two days before visiting mother's house once and leaving subpoena there); *People* v. *Bean*, 457 Mich. 677, 687–90, 580 N.W.2d 390 (1998) (state failed to exercise due diligence when its efforts to locate witness were limited to unsuccessful telephone calls, it failed to check for change of address form, match telephone numbers of witness' relatives to addresses or check public agency records, and it took "no steps whatsoever" to contact authorities in the District of Columbia, where neighbors and relatives informed investigators that witness had moved with his mother); *Hernandez* v. *State*, 124 Nev. 639, 649–52, 188 P.3d 1126 (2008) (efforts to procure attendance of out of state witness after she failed to appear for trial were not reasonable when state called her home, spoke only to child who mentioned family emergency but did not speak to witness or other adult to ascertain length of her absence or ability to return to Nevada, and did not seek continuance to obtain such information or to secure witness' attendance); *State* v. *Harris*, 279 Or. App. 446, 455–57, 379 P.3d 539 (2016) (after reluctant teenage witness in family violence case failed to appear in court despite being subpoenaed, "the state made *no* further effort to locate her or to compel her attendance at trial," "did not attempt to locate [the witness] through her mother, who was present at the courthouse, or through other relatives or law enforcement; [and] it did not send or even propose to send law enforcement to get her" or request continuance for that purpose [emphasis in original]), rev'd on other grounds, 362 Or. 55, 404 P.3d 926 (2017);[8] *State* v. *King*, 287 Wis. 2d 756, 768–69, 706 N.W.2d 181 (App.) (holding that it was unreasonable for state to opt to "persuade" witness

---

[8] The Oregon Supreme Court reversed on the issue of unavailability, but only because the defendant "objected to a continuance that would have enabled the state to pursue other means of securing [the] witness." *State* v. *Harris*, 362 Or. 55, 57, 66–67, 404 P.3d 926 (2017).

State *v.* Lebrick

to come to court rather than to serve her with subpoena when she was available, especially when state conceded that it had wrong address for seven prior attempts at service and had failed to serve her after being informed by victim's advocate that witness believed that she did not have to come to court without subpoena), review denied, 286 Wis. 2d 662, 708 N.W.2d 694 (2005); cf. *State* v. *King*, 622 N.W.2d 800, 807–808 (Minn. 2001) (reserving decision about availability but expressing concern that state had agreed to witness' release after his guilty plea, when plea testimony contained incriminating statements about defendant, and "expended minimal efforts" to find witness, as state did not contact witness' court services worker until after trial started, that worker made only single telephone call to witness, and state failed to contact witness' mother or spouse, who lived locally).

In contrast to these cases demonstrating a constitutionally inadequate effort to find a witness, I agree with the Appellate Court that the state's online and offline efforts in this case were reasonable and consistent with the prosecutor's obligation to provide procedural justice, even though the efforts were "not exhaustive." *State* v. *Lebrick*, supra, 179 Conn. App. 231–32. After his search of criminal and law enforcement records in Connecticut and New York was unsuccessful, Hightower utilized the CLEAR "data aggregator," which he understood from his training and experience to be a comprehensive resource, for his online search of numerous public and private records.[9] That online search identified several potential addresses in Brooklyn and Queens where Parks might be found, which

---

[9] The majority takes issue with Hightower's failure to conduct a basic Google or social media search for Parks, as well as his decision to rely on a search of the databases available through CLEAR once his searches in the Hartford Police Department and NCIC databases were unsuccessful. Although the majority's aspersion sounds good at first, given that the word "Google" is sufficiently ubiquitous as to be both noun and verb, it ultimately is not a fair criticism of Hightower's efforts, given the lack of evidence to establish that a standard Google search would have revealed any more

State *v.* Lebrick

Garguilo then checked multiple times to no avail, with the other residents at those locations not answering the door to furnish additional leads to Garguilo. There is no evidence that Garguilo or Hightower ignored potential leads; Parks did not want to be found, and their searches of available locations simply brought them to dead ends. Although Parks was a reluctant witness, there is no claim that the state could or should have acted peremptorily because of an indication that she planned to disappear or refuse to testify. See *People* v. *Fuiava*, 53 Cal. 4th 622, 676, 269 P.3d 568, 137 Cal. Rptr. 3d 147 ("[W]e could not properly impose upon the [p]eople an obligation to keep periodic tabs on every material witness in a criminal case, for the administrative burdens of doing so would be prohibitive. Moreover, it is unclear what effective and reasonable controls the [p]eople could impose upon a witness who plans to leave the state, or simply disappear, long before a trial date is set." [Internal quotation marks omitted.]), cert. denied, 568 U.S. 1069, 133 S. Ct. 788, 184 L. Ed. 2d 583 (2012). Put differently, the majority's assessment of the state's efforts to the contrary runs afoul of the maxim that "the question of whether an effort to locate a missing witness has been sufficiently diligent to declare that person unavailable is one that is inherently fact specific and always vulnerable to criticism, due to the fact that [o]ne, in hindsight, may always think of other things." (Internal quotation marks omitted.) *State* v. *Rivera*, supra, 221 Conn. 67; see *Ohio* v. *Roberts*, supra, 448 U.S. 75–76. Accordingly, I conclude that the Appellate Court properly upheld the trial court's determination that Parks was an unavailable witness for purposes of the confrontation clause and § 8-6 (1) of the Connecticut Code of Evidence.

Because I would affirm the judgment of the Appellate Court, I respectfully concur in part and dissent in part.

information about Park's whereabouts than the databases searched even under a "basic" subscription to CLEAR. See footnote 4 of this opinion.